# Mobile and Montgomery Railway Co. v. Steiner, McGehee &. Co.

61 559
d121 625
61 559
135 318

*Action against Carrier to recover Overcharges and Penalties, &c.*

1. *Case adhered to.*—The court adheres to its decision in *State, ex rel. Harrell, v. Mobile and Montgomery Railway Company,* 59 Ala.' 325, that the second section of the act of April 19th, 1873, which provides that railroad companies "may for the transportation of local freight, demand and receive not exceeding fifty per cent. more than the rate charged for the transportation of the same description of freight, over the whole line of its road,"— does not authorize the addition of fifty per cent. on the charge over the whole road, irrespective of the distance the freight may be carried, but only an additional fifty per cent. more per mile, for the distance local freight is carried, than the per mile rate charged on goods carried over the whole line.

2. *Act of April 19th, 1873, construed.*—The rate on freight "*carried over the whole line of its road,*" which furnishes the basis for the additional fifty per cent. allowed by that act, for the transportation of "local freight," is the rate charged on freight taken on at one terminus and discharged at the other; and not the rate for freight brought from or carried to a point beyond the termini of the road.

3. *Same.*—The rate which furnishes the basis on which local freight charges must be graduated, is the rate prevailing at the time of the shipment; and rates at any particular time in the past furnish no reliable guide for ascertaining present rates.

4. *Corporation formed under act to constitute the purchasers of a railroad, &c., a body corporate; rights and powers of.*—When the purchasers of a railroad form a corporation under the provisions of the statute—act "to constitute the purchasers of any railroad heretofore sold under authority of any law of this State, a body corporate and politic," approved December 17th, 1873, and amended March 20th, 1875—the new corporation succeeds to the franchises, faculties and powers of the old corporation precisely as surrendered or lost; though as to ownership of property and liabilities, it is a new corporation.

5. *Effect of acceptance of restrictions on corporate power not embodied in charter.*—If a railroad corporation, though originally chartered without restrictions as to the right to fix tolls, accepts a limitation or restrictions of such powers, on a valuable consideration—*e. g.,* as one of the conditions on which it receives aid from the State—such limitation inheres in its organic law, precisely as if originally incorporated therein; and a new corporation, formed by those purchasing its property, &c., under our statutes, succeeding only to the rights of the old, is bound by such limitations.

6. *Imposition of penalty; when not invasion of chartered rights.*—Where a law when a corporation is formed, or which it afterwards accepted, exacts certain duties of it, a subsequent statute imposing a penalty, where none existed before, for a failure to perform such duties, does not impair any corporate right or otherwise violate the constitution.

[Mobile & Montgomery Railway Co. v. Steiner, McGehee & Co.]

7. *Voluntary payment; what not.*—The nature of the business considered, the shipper does not stand on equal terms with the carrier, in contracting for charges for transportation; and if the shipper pays the rates established in violation of law by the carrier, rather than forego his services, such payment is not voluntary, in the legal sense, and the shipper may maintain his action for money had and received, to recover back the illegal charge.

8. *Constitution 1868; effect of, as to power to amend charter.*—The act to constitute the purchasers of any railroad, &c., a body politic and corporate, having been enacted, since article 13 of the constitution of 1868 became operative, and it, and similar provisions in the present constitution providing that the general laws, under which corporations may be framed, may be amended, altered or repealed, corporations thus formed are subject to legislative control.

9. *Act of April 19th 1873; penalties imposed by, not repealed.*—The penalties imposed by act of April 19th, 1873, are not repealed by the provisions of the "act to prevent excessive charges by railroad companies," approved March 17th, 1875.

10. *Effect of act repealing "act to furnish the aid and credit of the State of Alabama, for the purpose of expediting construction of railroads within the State."*—The repeal of the act under which the aid and credit of the State were extended to railroads, upon conditions therein recited, does not have the effect to release them from the restraints imposed by the 15th section of that act as to tolls and charges; nor to release the Mobile and Montgomery Railroad Company, to whose rights the appellant succeeded, from the restrictions imposed by section eight of the special act, under which the Mobile and Montgomery Railroad Company obtained State aid.

APPEAL from the Circuit Court of Butler.

Tried before Hon. JOHN K. HENRY.

The appellees, Steiner, McGehee & Co., brought this action against the appellant, the Mobile and Montgomery Railway Company, on the 14th day of February, 1876, to recover certain penalties which the complaint alleged the railway company had incurred, at various times, between the 21st day of April, 1875, and the 1st day of December of that year, by violating the provisions of the second section of " an act regulating the charges for transportation of freight upon railroads within this State," approved April 19, 1873. Some of the counts also sought to recover the amount of overcharges illegally exacted on freights, between the 1st day of December, 1875, and the 4th day of February, 1876.

The counts were two hundred and sixty-nine in number, but it is unnecessary to notice them in detail. The complaint, as amended, sets out the act authorizing the Governor to endorse the bonds of the Mobile and Montgomery Railroad Company, the acceptance of its provisions by that company, the issue of the bonds and a trust deed to secure the same, and the organization of the defendant corporation by the purchasers, at a sale under a decrée in chancery for foreclosure,—all of which matters are hereinafter fully set forth.

The defendant demurred to each count of the amended

complaint, on the ground, among others, that the act of April 19th, 1873, under which the plaintiff claims, was repealed by an act of the general assembly approved March 17, 1875. Defendant also demurred separately to each count, because the act of the general assembly approved April 19, 1873, and under which plaintiff claims, is unconstitutional as to defendant. This demurrer was overruled.

So much of the act of April 19th, 1873, under which the complaint was framed, and of the act of March 17th, 1875, which it was claimed had the effect to repeal the former law, as is necessary to a proper understanding of the points thus raised on demurrer, is given below.

The second section of the act of April 19th, 1873, enacts that all railroad companies in this State " may for the transportation of local freight demand and receive not exceeding fifty per cent. more than the rate charged for the transportation of the same description of freight over the whole line of its road ; and any railroad company, manager, agent, or officer, violating the provisions hereof, shall be liable to the party injured thereby in double the amount of the overcharge ; but in no case shall the penalty be less than $20."

The act to prevent excessive charges by railroad companies, approved March 17th, 1875, declares, " that any officer, manager, or agent of any railroad company, lessee, association or corporation, managing or operating any railroad in this State, who violates the provisions of an act, entitled an act regulating the charges for the transportation of freight upon railroads within this State—approved April 19th, 1873 —shall be guilty of a misdemeanor, and upon conviction thereof, shall be fined not less than one hundred, nor more than five hundred dollars for each offense."

On the same day, an act was passed repealing the " act to furnish the aid and credit of the State of Alabama for the purpose of expediting the construction of railroads within this State "—approved February 21st, 1870. This was the " general law passed at the present session," to which reference was made in the act hereinafter noticed, authorizing the endorsement of the bonds of the Mobile and Montgomery Railroad Company.

The defendant filed several pleas, and among them, two pleas setting up in substance the facts hereinafter stated as to the organization of the defendant corporation, and that at the time the law of April 19th, 1873, was enacted, under which the special counts were framed, the rates for transportation for freight over the line of railroad, now owned by

defendant, were regulated by section eight of the act to "authorize the Governor to endorse the bonds of the Mobile and Montgomery Railroad Company," and that neither the said Mobile and Montgomery Railroad Company, nor this defendant, ever accepted or consented to be governed by the provisions of the act approved April 19th, 1873; wherefore defendant is not liable to the penalties sued for in the special counts. The court sustained a demurrer to each of these pleas.

The evidence shows that the Mobile and Montgomery Railway Company, the appellant, was formed in this wise:

Under an "act to incorporate the Alabama and Florida Railroad Company," approved February 11th, 1850, a company was chartered to build and operate a railroad from the the city of Montgomery, Alabama, towards the city of Pensacola, Florida. This charter contained the usual provisions, and by its fifteenth section provided, that "after the completion of said road, or any part thereof, the said president and directors may levy and collect tolls from all persons, property, merchandise, and other commodity transported thereon; *provided*, the net profits shall not exceed twenty-five per cent. per annum."

This road was finished to the State line, near Pollard, Alabama, in the year 1861.

On the 15th day of February, 1856, the legislature of this State passed "an act to incorporate the Mobile and Great Northern Railroad Company." By this act a company was incorporated to build and operate a railroad "from the city of Mobile to a point on the Alabama and Florida Railroad," &c. The seventeenth section of this charter enacts, "that the directors shall have full power to establish such rates of tolls for the conveyance of persons and property upon the railroad, as they shall from time to time deem proper, and to levy and collect the same for the use of said company. All matters and things respecting the use of said railroads and the conveyance of passengers and property, shall be in conformity to such rules and regulations as said board of directors shall from time to time determine." This road was completed and operated from Pollard to Tensas, Alabama, before the year 1866.

Afterwards, the legislature passed "an act to consolidate and make joint stock of the Mobile and Great Northern Railroad Company, and the Alabama and Florida Railroad Company of Alabama, and to change the name of said company to the Mobile and Montgomery Railroad Company," ap-

proved August 8th, 1868. This act gave these companies " full authority to make joint stock of the two companies and to consolidate said companies into one corporation, by the corporate name of the Mobile and Montgomery Railroad Company," pursuant to the action of the stockholders of the companies, at their conventions.

The fourth section of this act provided, "That the said Mobile and Montgomery Railroad Company shall have all the rights, privileges, property, franchises and immunities, not inconsistent with those granted by this act, which have been given, granted, and confirmed to the said Mobile and Great Northern Railroad Company, and the Alabama and Florida Railroad Company, and the same are hereby given, granted, and confirmed to the said Mobile and Montgomery Railroad Company."

The two companies accepted the provisions of this act, and were duly consolidated under it.

On the 25th of February, 1870, the legislature passed " an act to authorize the Governor of the State of Alabama, to endorse on the part of the State, the first mortgage bonds of the Mobile and Montgomery Railroad Company."

This act authorized the Governor to endorse the first mortgage bonds of the company for the sum of two million five hundred thousand dollars, for the purpose of discharging existing liens upon its property, repairing and equipping its road between Montgomery and Tensas, and extending and completing it from Tensas to Mobile, which was required to be done by the first day of July, 1872.

The eighth section of said act provides "that the endorsement of the bonds of the Mobile and Montgomery Railroad Company as herein provided for, is conditioned that on and after the time fixed for the completion of said railroad from Tensas to Mobile, the Mobile and Montgomery Railroad Company shall transport passengers and freight at the same rates as provided for other roads in the general bill passed at the present session, to furnish the aid and credit of the State to expedite the construction of railroads."

The fifteenth section of the general act referred to, enacted that "as a condition on which the aid is granted by this act, the several railroad companies shall not charge more than four (4) cents per mile for each passenger traveling over their lines, and shall not charge more than twenty-five (25) per cent. higher rates for carrying local freight, than they will for carrying through freight; nor shall they discriminate unfavorably against any citizen of Alabama in respect of any of the benefits or privileges of their road."

The Governor endorsed the first mortgage bonds of the Mobile and Montgomery Railroad Company to the extent of $2,500,000, and it completed the road to Mobile within the prescribed period.

To secure the bonds thus issued, the Mobile and Montgomery Railroad Company executed and delivered a deed of trust to Philo C. Calhoun, Timothy H. Porter and Josiah Morris, which conveyed the railroad from Mobile to Montgomery with all its franchises, equipments, &c., to said parties in trust, for the benefit of persons who might hold the endorsed bonds. The deed of trust authorized the trustees in case of default in either principal or interest, to take possession of the road and operate it, and pay the amount out of the earnings thereof, and if these were insufficient, to sell the property conveyed, and if necessary to bid in the same for the protection of the bondholders.

Default having been made in the payment of interest, the trustees on the 13th day of September, 1873, filed their bill against the railroad company for a foreclosure of the mortgage and a sale of the property therein conveyed. The railroad company answered, and such proceedings were had thereon, that a decree was rendered in May, 1874, ordering a foreclosure of the mortgage and a sale of the property conveyed therein, which provided among other things, that the trustees might purchase for the benefit of the holders of the bonds. On the 10th day of November, 1874, the property was sold under this decree and purchased by the trustees for the benefit of the bondholders. The sale was reported to, and confirmed by the court at its November term 1874, and the register ordered to execute a conveyance to the trustee for the benefit of the bondholders. "A majority in interest of said bondholders were duly incorporated under the name of the Mobile and Montgomery Railway Company, under the act of the general assembly to constitute the purchasers of any railroad hereafter sold under authority of any law of this State, a body corporate and politic, approved December 17th, 1873, and the act amendatory thereof, approved March 20th, 1875."

The act of December 17th, 1873, enacts among other things "that in each and every case in which any railroad may hereafter be sold by the State of Alabama, or by any commission, officer or agent of said State, or under any proceeding judicial or otherwise authorized by law, the purchasers at any such sale may constitute themselves into a body politic and corporate, and shall have and possess all

the powers and franchises which belonged to the company, or corporation originally owning the railroad so purchased, including the power to purchase and hold real estate, and the franchise to be and exist as a corporation under such name as the purchasers may select and adopt. The board of directors of such new corporation shall have power . . . to lease, sell, or mortgage all or any part of the franchises or property of such corporation, including the franchise to be and exist as a corporation."

An amendment was passed March the 20th, 1875, the second, third and fourth sections of which are as follows :

"Sec. 2. Be it further enacted, that the word purchasers, as hereinabove used, in every case where the same occurs, be and the same hereby is declared to comprehend and mean, not the trustees merely making the purchase, but the persons for whom, in whose behalf, for whose benefit or advantage, or in trust for whom, such railroad is so purchased, being the persons who part with the actual consideration of such purchase; and in every case a majority in interest of such purchasers may organize such corporation, for the benefit of themselves and of all other persons having like interest in such purchase who desire to unite therein.

"Sec. 3. Be it further enacted, that the meaning and intendment of said word hereinabove declared, shall be accepted and received in all courts and places, in respect of any attempt at incorporation under said act, heretofore or hereafter made, in the same manner and to the same extent as if the same had been originally declared in said act; *Provided, always,* that the rights of any and all persons vested before the taking effect hereof, shall not be impaired or affected thereby.

"Sec. 4. Be it further enacted, that every body corporate and politic heretofore or hereafter organized pursuant to the provisions hereof, or of said act hereinabove referred to, within sixty days from the taking effect of this act, or within sixty days from the date of its organization, under the hand of its proper officer or officers, shall make and file its certificate in writing in the office of the Secretary of State of the proceedings had for its organization."

The evidence introduced on the trial shows that the plaintiffs were merchants doing business in Greenville, Ala., and during the periods mentioned in the complaint, and at various times, shipped over defendant's road large quantities of goods and twenty-nine hundred and thirty two bales of cotton. The distance by defendant's road from Greenville to Mobile

is one hundred and thirty-five miles, and from Greenville to Montgomery is forty-five miles. The charges upon cotton were two dollars and thirty cents per bale from Greenville to Mobile, and one dollar and fifty cents per bale from Greenville to Montgomery, and this charge was uniform from April 21st, 1875, to February 4th, 1876.

The evidence further showed that defendant refused to allow plaintiffs to have their cotton taken from defendant's warehouses, until the rates above set forth were paid or agreed to be paid, though on some occasions, the agent would send out the first load of the freight with the bill of charges, with the understanding that the bill would be paid when demanded, and but for such understanding, would not have allowed the freight to leave the warehouse, without prepayment of charges. Plaintiffs made a general complaint to Wilson, the defendant's agent at Greenville, and to Jordan the superintendent, that the charges for the transportation of said cotton and other freight were too high, but defendant refused to allow plaintiffs to have their cotton or goods, until the above rates were paid or agreed to be paid.

Plaintiff was introduced as a witness and asked "what was the distance from New York to Montgomery by the shortest railroad route. The defendant objected to the question as illegal and irrelevant. It was shown that the plaintiff had had various parcels of goods shipped from New York to Montgomery, and then the same goods shipped from Montgomery to Greenville on defendant's road, and it was proposed to be proved, what the through freight from New York to Mobile was for merchandise by connecting lines under special arrangements as herein stated, and that the different railroads from New York to Mobile pro-rated the freight according to distance. The court overruled this objection and defendant excepted. The witness answered that the distance was about twelve hundred miles."

The plaintiffs, against the objection and exception of defendant, were permitted to introduce the testimony of witnesses, as to the charges they had paid, during the periods laid in the complaint, on cotton and other freight from Selma and Benton, Ala., by way of the Western Railroad to Montgomery, and thence over defendant's road from Montgomery to Mobile, and on similar freight shipped from St. Louis and New Orleans over defendant's road from Mobile to Montgomery. It was shown that as to these freights, defendant pro-rated with the connecting railroads and other routes of communication, according to the distance such freight was

transported." It appeared from this testimony, that the freight charged by the defendant on the cotton and other goods shipped from Greenville, exceeded fifty per cent. more than the rate charged for the transportation of such freight carried over the whole line of its road, which it had received from connecting lines with which it pro-rated, according to the distance which the freight was carried. The testimony showed that the rates for the transportation of freight from Montgomery to Mobile and from Mobile to Montgomery, were constantly changed. The president and directors never fixed the tarriff, but left that matter to one Nason, the general freight agent. Some of these tariffs were printed and some not. The local freight agent, introduced as a witness, could not recollect what the tariff rates were at any one time from April 21st, 1875, to February 4th, 1876. A printed paper dated September 1st, 1875, which was shown to be a local tariff of rates for transportation of freight was handed the witness, but the witness could not tell when it went into effect or to what extent it was used. This paper showed the rates charged by defendant for the transportation of freight from Greenville to Montgomery, and from Greenville to Mobile, and *vice versa.*

The court gave a general charge to the jury, to several specified parts of which charge the defendant excepted.

The defendant requested thirty-one written charges, thirteen of which were given, and the remainder refused, and to which refusals it excepted.

Some of the charges refused, instructed the jury; 1st, that the defendant was not amenable to the provisions of the act of April 19th, 1873; 2d, that if plaintiff shipped his goods, knowing beforehand what rates were charged, and paid these rates without protest, the payments were voluntary, and could not be recovered back; 3d, that the defendant had power and authority to change its rates from time to time, and that proof of the rate charged at any particular date was not evidence of what rates prevailed before or after that time, because the defendant has failed to prove the rates at such subsequent and different times; 4th, the defendant had a right to charge for the transportation of local freight, fifty per cent. more than the amount charged at the same time for the transportation of the same description of freight from one of its termini to another; and if defendant did not exceed this amount, then it is not liable under any of the counts in the complaint.

There was a verdict and judgment for plaintiff for the sum of $5,155.75, and defendant appealed.

[Mobile & Montgomery Railway Co. v. Steiner, McGehee & Co.]

The rulings on demurrer, the rulings upon the admission of evidence, the charge given, and the refusals to charge as requested, are now assigned as error.

GREGORY L. SMITH, for appellant.—When the provisions of two statutes are repugnant, the latest prevails,—see Dwarris on Statutes, p. 156; note *Dash v. Van Kleek*, 7 Johns., 496–7; *Columbia Manufacturing Co. v. Van Pool*, 4 Cow. 556; *Jordan v. The State*, 15 Ala. 746—and operates a repeal of the former.—*Harrington v. Trustees of Rochester*, 10 Wend. 550; Bac. Abr. title Statutes, D.

When two statutes provide different penalties for the same offense, they are repugnant.—See *Nichols v. Squire*, 5 Pick. 168; *Commonwealth v. Kimball*, 21 Pick. 373; *Flatherty v. Thomas*, 12 Allen, 428; *Norris v. Crocker*, 13 How. 438.

This is so, although the latter statute provides the smaller penalty.—See *State v. Whitworth*, 8 Por. 435. And it is immaterial whether both penalties accrue to the State, or the first to an individual and the last to the State.—5 Pick. 168; 13 How. 438. A statute giving the party injured an amount in excess of the injury, is penal.—See *Stone v. Lannon*, 6 Wis. 497; *Reed v. Davis*, 8 Pick. 515–516.

This suit is brought under an act that restricts the rate of freight, and provides a penalty *for its violation*. A later act makes the violation of the terms of *this act* a misdemeanor, punishable by fine, and, therefore, repeals the former act.

When an act repeals a part of an act and substitutes other terms in lieu of the portion stricken out, it is said to amend such former act.—See *Longlois v. Longlois*, 48 Ind. 49; Bac. Abr. title Statute, D.

An act approved February 21st, 1870, provided, among other things, that railroads should not charge more than twenty-five per cent. higher rates for carrying local freight than they do for carrying through freight. The act under which this suit was brought was passed in 1873, and provided that railroads might charge a different rate. It therefore *amended the act of* 1870. The act of 1870, and *all acts amendatory thereof*, were subsequently repealed by an act of 1875, and I submit that the act under which this suit was brought was thereby repealed.

The appellant was organized under the general law of Alabama (Acts 1874–5, p. 132), allowing the purchaser of railroads to reorganize. Its meaning should be construed in the light of the reasons that led to its passage.—Dwarris on Stat. p. 655; *The Schooner Harriet Boynton et al. v. Claim-*

*ants*, 1 Story R. 251; *Harrison v. Walker*, 1 Ga. R. 32; *Wakefield v. Phelps*, 37 N. H. 295. From 1861 to 1865 the few railroads in the State were in a condition that rendered them useless. A thorough system of railroads was essential to the prosperity of the State; but the war had rendered the people too poor to build them without assistance from foreign capital, and capital would not invest without further security than that afforded by the property.

By an act of 1867 (Acts of 1866–7, p. 686), the State authorized an endorsement of railroad bonds. The same act provided that in case of default the State should take charge of the property to protect itself. *This act placed no restriction upon freight.*

To enable the State to dispose of any property that might thus get into its hands, an act was passed allowing the purchaser to reorganize with the powers and privileges of the *existing charters.*—See act August 12th, 1868. Several acts were then passed relating to the same subject, but applicable only to particular corporations. The next general act was passed in 1870, (Acts 1869–70, p. 149). This act restricted the right to charge for freight.—See § 15. There followed several other acts on the same subject, but applicable to particular roads. In 1872, the State found many of the roads for which it had endorsed defaulting in the payment of interest, and that it had incurred a liability of $18,291,000. See report of Commissioners to adjust the debt of Alabama. The State took control of the Alabama and Chattanooga Railroad under the provisions of the act of 1870, but found no relief in the management of the property, and it became evident that unless something was done, the State would soon be encumbered with every road in its territory. It • passed a series of acts offering large inducements for relief, (see act of December 21st, 1872, Acts of 1872–3, p. 52, and act of April 14th, 1873, Acts 1872–3, p. 53; act of April 15th, 1873, Acts of 1872–3, p. 58; act of April 21st, 1873, Acts 1872–3, p. 45), and among the inducements was a release from *all restrictions,* including restrictions on freight. The act of April 16th, 1873, Acts 1872–3, p. 59, was then passed, and it offered a release from *restrictions on freight, as a special inducement* to parties to relieve the State. The act of 1873 as amended, under which defendant was incorporated, had the same object in view; and it should be construed in harmony with this object.—*Noble v. State*, 1 Green. (Iowa) 325. This act gave the defendant all the powers and franchises of the company *originally* owning the road. The

companies originally owning the road were the Alabama and Florida Railroad and the Mobile and Great Northern Railroad, and among their powers was the right to regulate their own freight.

But if the defendant only took the powers and franchises of the Mobile and Montgomery Railroad Company, they would not be subject to the restriction. The acceptance of the act of 1870 by the Mobile and Montgomery Railroad only created a contract between it and the State, and did not affect its charter; and the defendant is not subject to the Mobile and Montgomery Railroad Company's contracts.. *Hall v. M. & M. Railway Co.* 58 Ala. 18.

The question of the defendant's chartered right to regulate its own freight would be free of doubt, but for article xiv. § 1 of Constitution of 1868; and that section provides for the repeal of the *general law only,* and not for the repeal of any right vested under such general law while it exists.—See Smith's Commentaries on Constitutional Construction, § 60, *et. seq.;* 5 Iowa (Clarke), 300; *North Canal Shore Railroad Case,* 10 Watts, 351.

It is clear that the framers of the constitution of 1875 so considered the law; for *in addition* to the clause in the constitution of 1868, they provide (art. xiv. § 10, and art. i. § 32,) for the repeal or alteration of *the charter granted under such general laws.*

The act under which appellant was organized was passed subsequent to the act under which this suit is brought, and repeals it so far as they are inconsistent. The act under which this suit was brought restricts freight, while the act of incorporation gives an unrestricted right to charge for freight. The latter, therefore, repeals the former in this respect.

Appellee claims that the State has a right to regulate freights, even where the company has a chartered right to regulate its own freight; the contrary is too well settled for discussion.—See *Central Railroad and Banking Company v. Georgia,* 2 Otto, 665; *S. W. R. R. Co. v. Ga.* id. 677; *New Jersey v. Yard,* 5 Otto, (95 U. S.) id. 679.

The evidence shows that the overcharges were made by the company's agents, and does not show that the company ever authorized or ratified the overcharge. Authority to do an illegal act can not be inferred from general agency. See *Patterson v. State,* 21 Ala. 571; *Seilbert v. State,* 40 Ala. 60; *Nall v. State,* 34 Ala. 262; *Morton v. Bradley,* 30 Ala. 683.

The right and the remedy are statutory and sufficient, and

[Mobile & Montgomery Railway Co. v. Steiner, McGehee & Co.]

must be averred to bring the offense within the terms of the statute.—*Smith v. Woodman*, 28 N. H. 520. All the facts necessary to constitute the offense must be averred.—5 Johns. 324 ; 13 Barb. 209 ; 13 Johns. 428 ; 4 Johns. 193 ; 17 Johns. 438 ; 7 Johns. 402 ; Minor R. 420 ; 7 Por. (Ala.) 284. No recovery can be had under the common counts. 54 Ala. 30 ; 5 Johns. 174 ; 5 Mass. 314 ; 55 Ala. 408 ; 7 Hill, 575 ; 3 N. Y. (Const.) 1.

The evidence showed that the freight was voluntarily paid. 1 Ala. 406 ; 5 Ala. 294 ; 21 Ala. 750 ; 2 Cow. 419.

Proof showed that freights changed frequently. Proof of a thing, not continuous in its nature, at any one time, is no evidence that it continued the same.—3 Phillip's Ev., Cowen and Hill's notes to, p. 437, p. 452 ; *Hart v. Newland*, 3 Hawk's Law and Eq. 122 ; Starkie's Law of Evidence, pp. 76 and 760 ; 8 Ala. 96 ; 4 B. & A. 161 ; 20 Ala. 294 ; 4 Metc. 545.

Under the act of 1873, but one penalty can be recovered. 46 N. Y. 644 ; 50 N. Y. 693.

CLOPTON, HERBERT & CHAMBERS, for appellant.—1. The Mobile and Montgomery *Railway* Company is not subject to, or governed by, the provisions of the act of April 19, 1873, under which this suit is instituted.

The incorporation of the Mobile and Montgomery Railway Company under the act of December 17, 1873, as amended by the act of March 20th, 1875, was a contract between the State and the corporators. "The theory of corporation is, that the privileges are conferred upon them in consideration of public benefit which will result from their operations. The production of such benefit constitutes the 'public service' for which the constitution permits the grant of peculiar privileges." . . . . . . . .

"This public benefit is deemed a sufficient consideration for a grant of corporate privileges." . . . This court expressed the same idea in the old case of *Aldridge v. Tuscumbia Railroad Co.*, 2 Stew. & Port. 211 ; *Daughdrill v. Ala. Life Ins. & Trust Co.*, 31 Ala. 91–98 ; *Jemison v. Planters & Merchants Bank*, 20 Ala. 167.

The legislative inviolability of the charters of private corporations was established by, and has been recognized ever since the decision of the Supreme Court of the United States in *Dartmouth College v. Woodward*, 4 Wheat. 518 ; *Planters Bank v. Sharp*, 6 How. 301 ; Cooley on Const. Lim. 279 ; 18 Wallace, 206 ; 5 Otto, 679.

2. When we consider the legislative and public history of the State, of which the court has judicial knowledge, it is evident that in the act of December 17, 1873, as amended by the act of March 20, 1875, authorizing purchasers of railroads to incorporate, there was a well understood subject of contract. The State had become liable to the amount of millions of dollars by its endorsements on the bonds of railroad companies. The purpose of the State was to be freed from this liability, and to this end, by said act, as amended, offered inducements to persons to become purchasers of railroads; the principle one of which was that they might constitute themselves into a body corporate and politic, and have and possess all the *powers* and *franchises* which belonged to the company originally owning the railroad.

It is too clear to be controverted at this day, in view of the foregoing authorities and facts, that the incorporation of the Mobile and Montgomery *Railway* Company was a contract between the State and the corporators, and gave and granted to them, at least, the *powers* and *franchises* which belonged to the Mobile and Montgomery *Railroad* Company.

Now, it must be observed that the act of April 19, 1873, "regulating the charges for transportation of freight," etc., under which this suit is brought, was passed several months prior to the passage of the act of December 17, 1873, authorizing purchasers of railroads to incorporate. This act of December 17, 1873, as amended by the act of March 20, 1875, is the last expression of the legislative will in respect to the powers and franchises of corporations formed according to its provisions. It is a special act to provide for special cases; and no reference whatever is made, in any part of it, expressly or impliedly, to the said act of April 19, 1873. If there be a conflict between them, the statute last enacted must prevail. And if there be no conflict, it is because each has its own field of operation, and the former statute does not, in any manner, affect the rights and powers vested under the latter.

3. The question next occurs, what powers and franchises the Mobile and Montgomery *Railroad* Company owned, which, by the act of December 17, 1873, were granted to the Mobile and Montgomery *Railway* Company, when it incorporated under that act?

We have shown that the Mobile and Montgomery Railroad Company was formed by the consolidation of the Mobile and Great Northern Railroad Company and the Alabama and Florida Railroad Company of Alabama. The act under

[Mobile & Montgomery Railway Co. v. Steiner, McGehee & Co.]

which this consolidation and organization took place, gave, granted and confirmed to the Mobile and Montgomery Railroad Company all the rights, privileges, property, franchises and immunities, not inconsistent with those granted by the act, which had been previously given, granted and confirmed to the Mobile and Great Northern Railroad Company and the Alabama and Florida Railroad Company of Alabama. The Mobile and Montgomery Railroad Company, then, owned and possessed all the powers and franchises which belonged to both said companies, by the consolidation of which it was organized.

It is therefore evident, from an inspection of the charters of the two corporations forming the consolidated corporation, that the Mobile and Montgomery Railroad Company, up to the time of the passage of the act authorizing the Governor to endorse its bonds, owned and possessed the same powers to levy and collect tolls, which each of said consolidated roads owned and possessed.

To what extent were these powers modified by said act authorizing the Governor to endorse said bonds? By the terms of said act, the endorsement of these bonds was on condition that on and after the time fixed for the completion of said railroad from Tensas to Mobile, the Mobile and Montgomery Railroad Company shall transport passengers and freight at the same rates as provided for other roads in the general bill, passed at the same session, to furnish the aid and credit of the State to expedite the construction of railroads. It must be noted, there is no *grant* of power, in this act, to levy and collect tolls. That power had been granted by the act of consolidation. This act was accepted by the Mobile and Montgomery Railroad Company, and this condition operated *only* as a limitation, by agreement, upon the exercise of the previously granted power to levy and collect tolls. It was not a surrender of the power which had been previously granted—otherwise, there should have been another grant of power.

This agreed limitation was not transmitted by the act authorizing purchasers to incorporate, to the Mobile and Montgomery Railway Company. The Mobile and Montgomery Railway Company was a new, distinct and independent corporation. It took everything by creation and grant, and acquired nothing by mere transmission. By the act, under which it became a corporation, the powers and franchises which were granted, were ascertained by *reference* to the powers and franchises that belonged to the company

originally owning the railroad, and which had the same legal result as if those powers and franchises had been specifically set out in the act.—*Shields v. Ohio*, 5 Otto, 319, 323.

In the act authorizing the Governor to endorse the bonds of the Mobile and Montgomery Railroad Company, there is no *express* authority, or requirement to execute a mortgage to secure the bonds. This is inferred or implied from the language of the act; such as "the first mortgage bonds of the said railroad company."

The contract, evidenced by the act, was not consummated until the execution of the mortgage, and the performance of all the terms required by the act. Until all this was done, the limitation upon the exercise of the power to levy and collect tolls did not become effective. By this mortgage, all the *franchises, tolls, issues and profits,* in addition to other property, were conveyed. What franchises were these? Certainly, those franchises which the Mobile and Montgomery Railroad Company owned and possessed previous to, at the time and independent of the act authorizing the Governor to endorse its bonds. They were its franchises, unincumbered by the limitations and conditions of that act.

The contract between the State and the Mobile and Montgomery Railroad Company, as set out in the act authorizing the Governor to endorse its bonds, was *personal* to each of the parties and bound them alone. The corporators of the Mobile and Montgomery Railway Company were holders of these bonds, to secure which mortgage was executed. By the sale of the railroad and other property, under the decree of said Chancery Court, said bonds were fully paid, and the State discharged from all liability on account of its endorsements thereon. The contract between the State and the Mobile and Montgomery Railroad Company was fully performed, executed, satisfied and discharged. Nothing of it, whatever, remained, and the Mobile and Montgomery Railroad Company virtually and practically, passed out of existence as a corporation. The Mobile and Montgomery Railway Company never received, or succeeded, as party or privy, to any of the benefits of said contract, and did not, and could not have succeeded to any of its burdens. Hence, the power and franchises granted to the Mobile and Montgomery Railway Company, by the act authorizing purchasers to incorporate, were the powers and franchises which belonged to the Mobile and Montgomery Railroad Company, unaffected by the terms and conditions of the act authorizing the Governor to endorse the bonds of the latter.

4. But, even if we are mistaken in this last position, and the powers and franchises of the Mobile and Montgomery Railway Company *are* encumbered and restricted by the limitation and condition provided by the eighth section of said act, still, we insist that the Mobile and Montgomery Railway Company is not subject to the provisions of the act of April 19th, 1873, under which this suit was brought, and that it is constitutionally protected against said act. It is clear that the legislature had no constitutional power to put said limitation and condition upon the Mobile and Montgomery Railroad Company without its consent. If it is a limitation upon the franchise, it was made by agreement, and was a condition to, or modification of a contract previously existing, viz: the charter of the company. Neither party to this contract could change or modify this limitation, condition or modification in any respect whatever, without the consent of the other party to the contract. The legislature, therefore, did not have the power to pass an act which changed or modified this condition or modification. It had no power to change *it*, to which no penalties were attached, by giving the right to charge higher rates of freight, to which heavy penalties are attached. The agreement or consent to limit, alter or modify, is the boundary of the legislative power—thus far it can go and no farther. It follows that the legislature had no power to subject even the Mobile and Montgomery Railroad Company to the provisions of the act of April 19th, 1873. Such an act impaired the obligation of the contract, and was violative of the Constitution of the United States.—6 Howard, 301–27 ; 4 Wallace, 535.

The annexing of heavy penalties, as is done by the act of April 19th, 1873, as effectually diminishes the value of the contract and impairs its obligation as any other legislation could do. It is imposing conditions not expressed in the contract.

It requires no argument to show that, without reference to any penalties, an act, the probable and natural effect of which is to compel the railroad company to charge such high rates for the transportation of freight over the whole line of its road as to destroy that branch of its business, or, else to carry local freight, in many instances, at less than the cost of transportation, which is the effect of the act of April 19th, 1873, as construed by this court, *does* diminish the value of the contract and impairs its obligation.

5. Neither in the charter of the Alabama and Florida Railroad Company, nor of the Mobile and Great Northern

Railroad Company, nor of the Mobile and Montgomery Railroad Company, nor in the act authorizing the Governor to endorse the bonds of the last company, is any right reserved to alter or amend in any respect whatever. But if there had been, this would not have affected the rights of the Mobile and Montgomery Railway Company, which was incorporated under an act passed subsequently to the act of April 19th, 1873.

This principle, as we understand it, has been clearly and explicitly decided in a late case by the Supreme Court of the United States, in the case of *New Jersey v. Yard*, 5 Otto, 104–113.

Upon the principle settled in that case, although the legislature may in the original charter and the first supplement thereto reserve the right to alter or amend; yet if a second supplement is enacted in which the right is not reserved, and which has the elements of a contract, the legislature has no power to alter or amend it. How much stronger is the case, when the corporation sought to be effected is a new and distinct corporation, with an original grant of powers? It follows that, if the legislature, in the act authorizing the Governor to endorse the bonds of the Mobile and Montgomery Railroad Company, had expressly reserved the right to alter or amend, this would not have been a reservation of a right to alter or amend the charter granted to the Mobile and Montgomery Railway Company by the act authorizing purchasers to incorporate.

It follows, further, that the imposition, by the legislature, in the act authorizing the Governor to endorse the bonds of the Mobile and Montgomery Railroad Company, of the condition therein expressed as to the charge for the transportation of local freight, and its acceptance by the company, did not give the right to the legislature to alter or amend, or impose other conditions; for, as was said in *New Jersey v. Yard*, *supra*, "it is not easy to see why such a provision should be extended beyond the terms in which it is expressed; and all the force which properly belongs to it is given, when the exemption from the constitutional provision against impairing the obligation of contracts, is extended as far as the language of the exemption justifies, and it should be extended no further by implication."

Much less would it be the reservation of a right to alter or amend the charter subsequently granted to the Mobile and Montgomery Railway Company, under a subsequent and distinct grant of powers in which no such right is reserved.

It is insisted, however, that the case of *Shields v. Ohio*, 5 Otto, *supra*, militates against the views above presented, but a careful examination of that case will show to the contrary.

It is further insisted that the regulation of charges for the transportation of freight and passengers on railroads, by the legislature, is a part of the police power of the State which the legislature can not alienate. It is difficult to see why the legislature can alienate the power to tax, which is the highest attribute of sovereignty, yet can not alienate the power to regulate the tolls on railroads. But on this point we are content to quote from Cooley on Const. Lim. 2d ed. marginal, p. 577 : "The limit to the exercise of the police power in these cases must be this : the regulations must have reference to the comfort, safety, or welfare of society ; they must not be in conflict with any of the provisions of the charter ; they must not, under pretense of regulation, take from the corporation any of the essential rights and privileges which the charter confers. In short, they must be police regulations in fact, and not amendments of the charter in curtailment of the corporate franchise."

6. The provision of article xiii. § 1, of the constitution of 1868, does not affect the question. It simply provides that all general laws passed, pursuant to that section, may be altered, amended or repealed. This clearly contemplates legislative action *subsequent* to the passage of the general laws. There has been no *subsequent* legislative action relating to the act under which the Mobile and Montgomery Railway Company was incorporated. The act of April 19th, 1873, was prior thereto, and, therefore, the constitutional provision has no application. Where the charter reserved to the legislature the right of modification after the corporators had been reimbursed their expenses in constructing a bridge, with twelve per cent. interest, an amendment before such reimbursement, requiring the construction of a certain bridge, was held unconstitutional and void.— *Washington Bridge Co. v. State*, 18 Conn. 53. Even if the constitutional provision did apply, the repeal or modification of a general law, under which rights have vested, can not defeat such vested rights.

We think we have established the following propositions : That the Mobile and Montgomery Railway Company was vested with all, or some of the following powers :

Either, 1st. To establish such rates of tolls as its directory shall from time to time deem proper ; or,

2d. To lay and collect tolls, the amount of which are re-

stricted only by the provision that the net profits of the road shall not exceed twenty-five per cent. per annum; or,

3d. Both, or one of the foregoing powers, the exercise thereof limited by the agreement not to charge more than twenty-five per cent. higher rates for the transportation of local freight, than it will for carrying through freight, without any penalties thereto attached.

We think we have also established that a provision in a general law that a railroad company may, for the transportation of local freight, demand and receive not exceeding fifty per cent. more than the rate charged for the transportation of the same description of freight over the whole line of its road, is inconsistent with the due and proper exercise of either of the foregoing powers.

When, however, the power of alteration and amendment is reserved, it is not without limit. "The alterations must be reasonable; they must be made in good faith, and consistent with the scope and object of the act of incorporation. Sheer oppression and wrong can not be inflicted under the guise of amendment and alteration. Beyond the sphere of the reserved powers, the vested rights of property of corporations, in such cases, are surrounded by the same sanctions and are as inviolable as in other cases."—*Shields v. Ohio*, 5 Otto, 324.

The effect and consequence of the second section of the act of April 19th, 1873, if continued and enforced, are too' palpable to require discussion. The result will be the destruction of the railroad interest in Alabama. It is unreasonable and oppressive, and therefore void, if for no other reason.

7. On March 17th, 1875, Acts 1874-5, page 243, the legislature passed an act which provided that any officer, manager, or agent of any railroad company, lessee, association, or corporation, managing or operating any railroad in this State, who violates the provisions of the act of April 19th, 1873, shall be guilty of a misdemeanor, and upon conviction thereof shall be fined not less than one nor more than five hundred dollars for each offense. It will be seen by comparison, that the persons mentioned in this act are the same as those mentioned in the first section of the act of April 19th, 1873. It is, therefore, evident that the legislature intended to subject to punishment by indictment for a violation of the provisions of the act of April 19th, 1873, the same persons who are mentioned in the first section of that act, and this includes corporations managing and operating

railroads in this State. That an indictment will lie against a corporation is established.—*Owsley v. Montgomery and West Point R. R. Co.*, 37 Ala. 560; Ang. & Ames on Corp. § 394; *Commonwealth v. New Bedford Bridge*, 2 Gray, 339; *State v. Vermont R. R. Co.*, 27 Vermont, 103; *State v. Morris and Essex R. R. Co.*, 23 N. J. L. 360. The act of March 17th, 1875, covering every offense found in the act of April 19th, 1873, and prescribing a new and different penalty, recoverable by indictment, is plainly repugnant to the act of April 19th, 1873, and repeals it so far as relates to the penalties.—*Norris v. Crocker*, 13 How. 429, 438; *Nichols v. Squire*, 5 Pick. 168. The act of April 19th, 1873, so far as relates to the penalties, was, therefore, repealed at the time this suit was commenced.

8. In discussing what is meant by the words in the statute of April 19th, 1873, "for *the transportation of the same description of freight over the whole line of its road,*" the counsel for appellee use the words "*through freights*" as if those words were used in the act. They are found only in the general law of February 21st, 1870, and the evidence shows that they have a technical meaning among railroad men, and as applied to the defendant embrace only freights coming over other roads and passing over the whole or a part of its road. Such freights may or may not pass over the whole line of its road. These words having obtained a fixed and definite meaning, it is to be inferred that they were used in that sense. In the second section of the act of April 19th, 1873, different words were used—"*over the whole line of its road*"—and the conclusion is, that the legislature intended something different from what is meant by the words used in the former general law. These last words mean freight shipped at or from one terminus of the road to the other. Hence the rate charged for *through freight* is not the basis fixed for the rate to be charged for the transportation of local freight by the act of April 19th, 1873.

The legislature, in that act, used the terms "*local freight*" and "*freight over the whole line of its road*" as correlative terms; by "*local freight*" was meant freight shipped from either terminus to a way station, or *vice versa*, or from one way station to another, that is over a part of the road only. And "*freight over the whole line of its road,*" means as the correlative, freight shipped at and from one terminus to the other. The intention of the legislature was to fix the minimum limit of discrimination against persons who had to ship to and from way stations in favor of persons who shipped at

and from one terminus to the other; and the rate for the transportation of *through freights* as the basis upon which to fix the rate for the transportation of local freight was abandoned in the act of April 19th, 1873, with the view of leaving the railroad companies free from all restrictions and limitations as to competing for through freights at the terminal point of shipment with other roads running through other States, thus increasing the business, advancing the interests, and enhancing the prosperity of the State.

WATTS & SONS, with whom was L. D. BROOKS, *contra.* 1. Was the appellant bound by and amenable to the law of the 19th April, 1873? The facts in the record show that the defendant bought all the rights which the Mobile and Montgomery *Railroad* Company had at the time its road was sold under a decree of the Chancery Court of Montgomery.

It is certain that the appellant was and is a railroad company in this State, and it is certain that it is liable to the penalties imposed by the statute, unless there is something in its charter which forbids the legislature from regulating its rates of charges for the transportation of goods.

The appellant organized itself into a corporation, under the law of 17th December, 1873, (see acts of 1873, pp. 56 and 57.)

It is scarcely necessary to remark that the words, "the powers and franchises which belonged to the company or corporation originally owning the railroad so purchased," as used in that act, only mean such powers and franchises belonging to the company whose road is sold, at the time of the sale or decree of sale.

The question then is narrowed down to this: What powers and franchises did the Mobile and Montgomery *Railroad* Company possess at the time its road was sold under the decree of the Chancery Court? Whatever rights, powers, franchises and immunities it possessed, the defendant succeeded to. It then stands in the shoes of the Mobile and Montgomery *Railroad* Company. If the legislature had the right, on the 19th of April, 1873, to regulate its rates of freight, then, to the same extent, the appellant is bound by any law passed by the legislature. And especially is this so, as the appellant was organized after the passage of the law of the 19th April, 1873.

We must then inquire what right the legislature had, on the 19th of April, 1873, to regulate the rates of freight of the Mobile and Montgomery *Railroad* Company?

[Mobile & Montgomery Railway Co. v. Steiner, McGehee & Co.]

It is unnecessary to discuss the question how far the legislature had the power to regulate the rates of freight of railroad companies generally.    And it is equally unnecessary to inquire whether such power could have been exercised by the legislature under the original charters of the Mobile and Montgomery *Railroad* Company.    We need only inquire the *status* of the consolidated corporation at the time of the sale.

After the consolidation, the Mobile and Montgomery Railroad Company applied to the legislature to obtain an endorsement of its bonds; and the legislature passed an act authorizing the Governor of the State to endorse its bonds to the extent of $2,500,000.    One of the conditions of this endorsement was that the Mobile and Montgomery Railroad Company, after the time fixed for the completion of the road from Tensas to Mobile, viz., July 1st, 1872, shall transport passengers and freight at the same rates provided for other railroad companies in the general bill passed at the same session of the legislature to furnish aid and credit of the State to expedite the construction of railroads.

The general bill referred to provides:  " That as a condition on which the aid is granted by this act, the several railroad companies *shall not charge* more than four (4) cents per mile for each passenger traveling over their lines, and shall not charge more than twenty-five (25) per cent. higher rates for carrying local freight than they will for carrying through freight, nor shall they discriminate unfavorably against any citizen of Alabama, in respect to any of the benefits or privileges of their roads."

2. The Mobile and Montgomery Railroad Company accepted the endorsement of its bonds on the conditions prescribed in the act authorizing the endorsement, and completed the road from Tensas to Mobile before the passage of the act of April 19th, 1873.    Thereby the company placed itself under the same control and power of the legislature as to freight and passengers that the State could exercise over any company receiving the aid of the State.—See *Mon. Navigation Co. v. Coon*, 6 Penn. St. 382; 7 Greenleaf Rep. 470; Gray, 234.

It is clear that under the terms of the law above quoted, the legislature had the right to regulate the rates of freight *above* those prescribed in the act of February 21st, 1870. By the terms of the 15th section of the act, the Mobile and Montgomery Railroad Company, after accepting the provisions of that act, had no right to charge more than twenty-five per cent. on local freight over through freight.    To

charge more would not only violate its contract with the State (which thereby became a part of its charter), but would violate a general law of the State, unless the legislature by some act authorized an increase of the rates. The legislature, without the consent of this company, could not require it to transport local freight for *less* than twenty-five per cent. above the rates of *through* freight. By the terms of this contract and law, the rates of *through* freights were left *unrestricted*, except so far as that it could not discriminate against the citizens of this State and connecting roads. The company could charge, subject to the foregoing restrictions, any rate of through freights. The only restriction was on its right to charge more than twenty-five per cent. excess on *local* freight over *through* freight. It will scarcely be contended that the legislature can not impose a penalty on any body or corporation for the violation of a law which that body or corporation is bound to obey. The power of the legislature is plenary, except in so far as it is restricted by its own or the Federal constitution.—*Dorman v. The State*, 34 Ala.; *Gowen v. Penobscott R. R. Co.*, 44 Maine, 135.

The right of the legislature to punish for the violation of law, has not been restricted by its contract with this company; neither, indeed, could the legislature deprive itself of such right, if it would.

Now the legislature, by the act of the 19th of April, 1873, has granted to all railroad companies under its control the right to charge fifty per cent. excess on *local* freights over and above the rate it may charge on *through* freights; and it imposes a penalty for the violation of this law. In the same act the right to charge a higher rate for the transportation of passengers than that allowed by the law of the 21st February, 1870, is given.

By the law of the 21st of February, 1870, and by the act of the 25th of February, 1870, the Mobile and Montgomery *Railroad* Company, as well as every railroad company in the State, which received aid and credit of the State, placed itself under the power of the legislature to regulate its rates of *local* freights *above* the limits prescribed in the law. The law of the 19th of April, 1873, was then strictly within the limits of legislative power. In passing it the legislature violated no contract with the Mobile and Montgomery Railroad Company, because that company had voluntarily, and as a condition upon which it obtained the endorsement of its bonds, placed itself under the power of the State to that extent.

[Mobile & Montgomery Railway Co. v. Steiner, McGehee & Co.]

After this company received the endorsement of its bonds, under the law of the 25th of February, 1870, the State could pass any general law governing it, within the scope of legislative powers as to rates of freight, provided the rates prescribed should not be lower than those prescribed in the law of the 21st February, 1870, and the company's assent to such a law would be no more necessary to its validity than its assent to any other general law of the State. To make a law binding on the citizens generally, it is not necessary to have the consent of the citizens to its passage, except such consent as is implied by the passage by the legislature of a constitutional law.

3. If the defendant stands in the shoes of the Mobile and Montgomery Railroad Company, the legislature had the right to regulate its rates of freight for local transportation. If the defendant was a corporation, created under the general law, then this new corporation was subject to the legislature under the constitution of 1868.—See *State v. Maine Central*, 488 ; see, also, 55 Ohio St. 21.

The constitution prohibits the creation of any *new* corporation, such as this, by special enactment. So that it either follows that the act making this defendant a corporate body is unconstitutional, or else it is subject to the power of the legislature as to its rates of freight.

A corporation can not object to the constitutionality of a law imposing liability, when the statute antedates the creation of the corporation.—*Philadelphia v. Com.*, 52 Penn. St. 451. The power to amend is in the constitution and need not be inserted in the charter.—See *Del. R. R. Co. v. Sharp*, 5 Harr. (Del.) 454; 32 New Jersey Law, 134; 21 N. Y. 9.

It will be observed that the eighth section of the law of the 25th of February, 1870, requires the Mobile and Montgomery Railroad Company to conform to the rates prescribed in the law of the 21st of February, 1870. This is precisely equivalent in legal effect to the incorporation of the 15th section of the law of the 21st of February, 1870, into the law of the 25th of February, 1870.—*Wood v. Hustis*, 17 Wis. 416.

Of course, then, the repeal of the law which gave aid and credit to the railroads could have no effect on the law of the 25th of February, 1870.—*Wood v. Hustis*, 17 Wis. 416. The repeal had only the effect to prevent the aid and credit provided for by it, to be given in the future. The repeal could not affect the rights of any person which had vested whilst the law was in force and unrepealed.—See *Wood v.*

*Hustis,* 17 Wis. 416; *Crosby v. Smith,* 19 Wis. 453; *Sika v. C. & N. W. R. R. Co.,* 21 Wis. 370.

4. Has the law of the 19th of April, 1873, been repealed?

It is said that it was repealed by the law of the 19th of March, 1875. This law simply repeals the law of the 21st of February, 1870, which gave aid to railroad companies.

The repeal did not and could not affect the rights of any company to the endorsement of bonds made before the repeal. The law of the 25th of February, 1870, was not repealed by it. The law of the 25th of February, 1870, incorporates the 15th section of the law of the 21st of February, 1870; but the repeal of the law of the 21st of February, 1870, could not, and it was not intended, to repeal the law of the 25th of February, 1870.

But it is argued by the counsel for appellant, that the act of March 17, 1875, "to prevent excessive charges by railroad companies," repeals the act of the 19th of April, 1873. It will be observed that this act does not, either in its title or its body, purport to *repeal* the act of the 19th of April, 1873. If it repeals it at all, it must be because it is in irreconcilable conflict with and repugnant to it.

It will be observed that this act of the 17th March, 1875, makes any officer, manager or agent of, &c., &c., managing or operating any railroad in this State . . . . *who* violates, &c., liable to indictment and fine. It does not undertake to make any railroad *company,* lessee, association, or corporation liable to indictment, but only imposes the penalty *on,* and applies only *to,* the *officer,* manager or agent of such railroad company, lessee, association or corporation. The argument is made that the railroad company, because it is a corporation, is liable to indictment, and that therefore the act is as broad, and covers the same persons and things, as the act of the 19th of April, 1873.

But it is quite clear, if the legislature had intended to make the railroad company itself indictable, as well as the officer, manager or agent, the language of the act would have been quite different, and would have left no room for doubtful construction.

According to the argument of appellant's counsel, the statute does not make liable to indictment the officer, manager or agent of the lessee, association or corporation; but it makes liable the lessee, the association and corporation, and not the officer, manager or agent of either.

5. The question is narrowed down to this: Under the law of

[Mobile & Montgomery Railway Co. v. Steiner, McGehee & Co.]

the 17th of March, 1875, can a *railroad company* be indicted?
Suppose a railroad company to be indicted under this statute,
and the indictment demurred to; what would be the argu-
ment? It could be justly said the law is a penal statute,
and must be construed strictly. It is the officer, manager or
agent *of the railroad company* who, by the express terms of
the statute, is made indictable, and it is nowhere said that
the *railroad company itself* is made indictable.

If a railroad company is not liable to indictment under it,
then it is clear that there can be no irreconcilable repug-
nance between it and the act of the 19th of April, 1873.

But if the railroad company was liable to indictment un-
der it, still there is no irreconcilable repugnancy between
the two. The two acts are not so repugnant but that they
can both stand. There is a clear field of operation for
both.

The act of April 19th, 1873, provides a remedy for the
party injured by the violation of its provisions by any rail-
road company, and makes it liable to him in double the
amount of the illegal charges, but in no case less than twenty
dollars. The one statute gives a civil remedy for his injury
to the party injured; the other provides a remedy to the
public wrong by means of an indictment. The latter one
provides a cumulative remedy for the violation of the pro-
visions of the act of April 19th, 1873.—See Smith's Com.
§ 759; Potter's Dwarris, 156–7; *Bush v. Republic*, 1 Texas.

Repeals by implication are not favored, and this rule must
be more stringent, since the constitution requires the title to
express clearly the subject of each law. It is clear that there
was no intention to repeal. There is none expressed, and
there is no irreconcilable repugnancy between the provisions
of the two.—See *Iverson v. The State*, 52 Ala. 170; *Gohen
v. Texas & P.*, 2 Woods C. C. (Rep.) 346; *Pacific R. R. Co.
v. Cass Co.*, 53 Mo. 17.

To hold then that the law of the 17th of March, 1875, re-
peals the act of the 19th of April, 1873, is to hold that the
former violates the constitution. The "title" of this act is
"to prevent excessive charges by railroad companies." This
act is wholly unconstitutional, because its "title" does not
clearly express the "subject" of it. Who would suppose,
from reading such a "title," that the body of the act made is
a misdemeanor in the agent, officer or manager of a rail-
road company to violate the statute of the 19th of April,
1863?

Who would suppose, from such title, that a "lessee or an

association," operating or managing a railroad in this State, who violated the provisions of the law of the 19th of April, 1873, should be subject to the indictment and fine? Who would suppose, from reading such a title, that a "railroad company" managing or operating a railroad in this State is, in the body of the act, made liable to indictment for violating the provisions of the act of the 19th of April, 1873?

6. In order to determine whether some of the testimony as to distance from New Orleans to Montgomery, and from New York and other places to Montgomery, was correctly admitted, it is necessary to inquire what is meant in the laws of the 21st and 25th of February, 1870, and 19th of April, 1873, by the terms rates of "local freights" and rates of "through freights." When we look at these different laws, and think of the purposes to be accomplished by the restriction, it must be obvious that by "local freights" are meant such freights as are charged for the transportation of goods for any distance on the road less than its whole length; and by *rates of through freight* are meant the rates charged for the transportation of goods over the whole line of its road from one terminus to the other. If goods were shipped from Atlanta to Mobile, and transported over the line of defendant's road to Mobile, the rates charged for such transportation by the defendant could be nothing else than for through freight. They certainly would not be rates for "*local freights.*" There are no other rates named in the laws but *local* and *through* rates.

When the legislature imposed the penalty for charging on local freights more than fifty per cent. over the rates charged for through freights, the language could not be mistaken or misunderstood. The language of the law leaves no room for doubt. It is this: When it describes what is meant by through freight, the language is, "the *rate* charged for the transportation of the same description of freight over the whole line of its road." What is meant by *through* freight, as contradistinguished from "local" freight, is thus defined by the statute itself. That which is within the letter of the law must likewise be within its spirit, unless there is something in the context or surrounding circumstances—something in the evil sought to be remedied—which shows clearly that that which is within the letter, is not within the spirit of the law. "It is not true that the courts, in the exposition of penal statutes, are to narrow the construction. We are to look to the words in the first instance, and when they are plain we are to decide on them. If they are doubtful,

we are *then* to have recourse to the subject matter; but at all events it is only a secondary rule."—See Bacon's Ab. 9, 253. "It is the duty of judges to put such construction upon a statute as may redress the mischief, guard against all subtle inventions and evasions for the continuance of the mischief *pro privato commodo,* and give life and strength to the remedy *pro bono publico* according to the true intent of the makers of the law."—See Bacon's Ab. 9, 251–52. What was the mischief intended to be remedied? The excessive and extortionate charges, for *local* freights, made by railroad companies, on persons who shipped freight to be transported over a portion of the lines of railroad less than "the whole line of the road."

Any testimony which tended to show what were the rates of through freights was competent; for under the law, only fifty per cent. above them was allowed to be charged on "local freights." In order, then, to show what was charged by the defendant for through freight, it was competent to prove what charge for freight was made for goods transported from Atlanta, or New Orleans, or New York, or St. Louis, over the whole line of defendant's road. It was also competent to show the distances from New York, or New Orleans, to Montgomery, because the defendant, under the law, and by its agreement, shown in the evidence, *pro-rated* with connecting roads according to the distances. The ninth section of the act of February 21, 1870, requires the defendant to *pro-rate* with connecting roads and to make no discriminations, etc.—*State, ex rel. Harrell, v. M. & M. Railway Co.,* 59 Ala.

7. The penalty does not depend at all on whether the shippers of the goods paid voluntarily or *involuntarily* the illegal charges. The defendant shall not *demand* and *receive* for the transportation of "local freights" exceeding fifty per cent. more than the *rate* charged for the transportation of the same description of freight "over the whole line of its road." The violation of the law consists in *demanding* and *receiving* the illegal charges, whether paid voluntarily or involuntarily.

And a recovery, under the count for money had and received, for the overcharges, depends as little on the question whether charges were paid with or without protest, whether voluntarily or involuntarily.—See 1 Redf. on Railways, subdivisions 2 and 3, § 124, pp. 447–8; 2 Greenleaf on Ev. § 121, and authorities cited in note 5; *Parker v. Great Western R. R. Co.,* 7 Man. & G. 292, where the whole subject is

discussed; *Chandler v. Sanger*, 114 Mass. 364; *Town Council v. Burnett*, 34 Ala. 156; *Carew v. Rutherford*, 106 Mass. 1.

Although it is a general rule that money paid voluntarily with full knowledge of the facts, can not be recovered back in an action for money had and received, yet it is equally well settled that money is not *voluntarily* paid when it is paid to any one having, at the time, the power to enforce his demands, such as a tax-collector, or to a bailor by a bailee, in order to get possession of the goods, or where it is paid under an illegal exaction of tolls, or freights, or taxes. And it is not necessary to make *protest* in such cases, at the time of payment, unless where an agent is sued, and then the protest is necessary to enable the agent to retain the money as against his principal.—*Harmony v. Bingham*, 2 Kernan, 93; *Colwell v. Peden*, 3 Watts, 328; 2 Greenl. Ev. 121, and note 5, *supra;* 2 Starkie Ev. on p. 85, and notes; 1 Redf. on Railways, § 124, *supra; Baker v. City of Cincinnati*, 11 Ohio St. 536; *Parker v. Great Western R. R. Co.*, 7 M. & G. 253, *supra; Barton & S. G. Co. v. City of Boston*, 4 Metc. 187; *Stephan v. Daniels*, 27 Ohio St. 527; *Howe v. State*, 53 Miss. 66; *McKee v. Campbell*, 27 Mich. 497.

No protest is necessary in such a case.—See *Conrad v. Zeluff*, 26 Mich. 118; *First Nat. B'k v. Watkins*, 21 Mich. 483.

The *Lafayette & Ind. R. R. Co. v. Patterson*, 41 Indiana Rep. 312–329, 330, is directly in point as to the right to recover back the illegal freights.—See, also, the case of *C. & A. R. R. Co. v. Coal Co.*, 79 Ill. on p. 121, which in principle is precisely like the case at bar.—See, also, *Potomac Coal Co. v. Cumberland & Pa. R. R. Co.*, 38 Md. 226; *Tuttle v. Everett*, 51 Miss. 27.

Whenever a person is compelled to pay to a public officer, in order to induce him to do his duty, fees to which by law he is not entitled, they may be recovered back.—*Robinson v. Ezzell*, 72 N. C. 231; see, also, *Briggs v. Boyd*, 56 N. Y. 292.

It was asserted in the argument by the counsel for appellant, that inasmuch as the statute creates a remedy for the party injured, he can have no other remedy, and that he can not recover for the excessive overcharges under the common counts. Whenever illegal overcharges are demanded and received, by any person having the power to coerce the payment (as defined in the authorities herein cited), the person thus receiving the illegal excess, in the eye of the law holds that much money which *ex equo et bono* belongs to the party paying; and according to the well settled, yet plastic prin-

ciples of the common law, a suit for money had and received may be maintained by the injured party to recover of the wrong-doer.—*Fuller v. The Chicago & N. W. R. R. Co.*, 31 Iowa; *Parker v. G. W. R. R. Co.*, 7 M. & G.

In this, and most of the States, the railroad companies have great and exclusive privileges. They have the right to use another's real estate without his consent, and, owing to the public benefit supposed to be derived from them, they are allowed rights no private citizen could have conferred on him by legislative power.—See *Tuscumbia C. & D. R. R. Co. v. Aldridge*, 2 S. & P. 139; *Daughdrill v. Ins. Co.*, 31 Ala.

The Mobile and Montgomery Railroad Company, in whose shoes defendant, the Mobile and Montgomery *Railway* Company, stands, asked of the legislature a favor, and the legislature imposed a condition on the grant of that favor, and this condition thus became a part of its charter whenever it accepted the favor; and it was as binding on the company as if it had been originally a part of the charter.—See *Mobile and Ohio Railroad Co. v. State*, 29 Ala. 573.

STONE, J.—In the case of the *State, ex rel. Harrell, v. The Mobile and Montgomery Railway Company*, 59 Ala. 321, we construed, in part, the act " regulating the charges for transportation of freight upon railroads within this State," approved April 19th, 1873, Pamph. Acts, 62. In that statute it is declared, " that all railroad companies in the State . . . . may, for the transportation of local freight demand and receive not exceeding fifty per cent. more than the rate charged for the transportation of the same description of freight over the whole line of its road." In the case referred to, it is said, " we can not assent to the argument that the fifty per cent. additional, which the statute allows the corporation to charge for transportation of local freight, means fifty per cent. on the charge over the whole line of the railroad, irrespective of the distance the local freight may be carried. The language of the statute forbids that construction. " Fifty per cent. more than the *rate* charged . . . . over the whole line of its road," are the words of the statute. Rate is the emphatic word of the sentence. In this connection it is employed in the sense of proportion,— a standard of valuation; a rule or measure of assessment. That is, an assessment according to a given standard. The charge for transportation over the whole line is so much, which is equivalent to so much per mile. Local freight

must be carried at the same rate, *plus* fifty per cent. Thus, if the charge over the whole line be 100, the charge over half the line will be 50, *plus* 50 per cent.—25-100; equal to 75-100, the true result." It is contended for appellant that the word rate, in the statute quoted, was employed to express the class or quality of the freight over the whole line of the road, by whose tarriff the legislature intended to graduate the tolls for local freights; and that the permitted charges for transporting local freight, no matter how short the distance, might be raised to a sum which will be equal to fifty per cent. increase on the charge for the same class of freight over the whole line of the road. This would not only give to the word a strained interputation, but would render it meaningless, superfluous and unnecessary. Another clause in the statute expresses that idea in language so plain, that it can not be misunderstood. "The rate charged for the transportation of the *same description* of freight," is the language of the law. This is the declared standard by which the legislature intended railroads should be governed in adjusting their tariffs of local freights. We adhere to our former construction of this statute.

It is contended for appellant that the Mobile and Montgomery Railway Company is not bound by the statute above considered. The Mobile and Montgomery Railway Company is the successor of the Mobile and Montgomery Railroad Company, which was formed by the consolidation of two other incorporated railroad companies, and had conferred upon it the powers, privileges, immunities and franchises of each of said original corporations. Those original companies, and the Mobile and Montgomery Railroad Company had unlimited power and discretion in the matter of levying tolls and charges. They were organized under special charters granted to each. Under the act "to authorize the Governor of the State of Alabama to endorse, on the part of the State, the first mortgage bonds of the Mobile and Montgomery R. R. Co.," approved February 25th 1870—Pamph. Acts, 175—the Governor endorsed the bonds of the said company to the extent of two and a half million of dollars, which bonds were received and used by the company in the repair and completion of its road. The eighth section of this act declares "that the endorsement of the bonds of the Mobile and Montgomery Railroad Company, as herein provided for, is conditioned, that on and after the time fixed for the completion of the said railroad from Tensas to Mobile, the said Mobile and Montgomery Railroad Company shall

transport passengers and freight at the same rates as provided for other roads in the general bill, passed at the present session, to furnish the aid and credit of the State to expedite the constructions of railroads." The time fixed by said act for the completion of the railroad from Tensas to Mobile, was July 1st, 1872.

Section 15 of the act " to furnish the aid and credit of the State of Alabama for the purpose of expediting the construction of railroads within the State," approved February 21, 1870, Pamph. Acts, 149, enacts "that as a condition on which the aid is granted by this act, the several railroad companies shall not charge more than four (4) cents per mile for each passenger travelling over their lines; and shall not charge more than twenty-five (25) per cent. higher rates for carrying local freight than they will for carrying through freight."

The act " to constitute the purchasers of any railroad hereafter sold under the authority of any law of this State a body corporate and politic," approved December 17, 1873—Pamph. Acts, 56—provides "that in each and every case in which any railroad may hereafter be sold by the State of Alabama, or by any commission, officer or agent of said State, or under any proceeding, judicial or otherwise authorized by law, the purchasers at any such sale may constitute themselves into a body politic and corporate, and shall have and possess all the powers and franchises which belonged to the company or corporation originally owning the railroad so purchased, including the power to purchase and hold real estate and the franchise to be and exist as a corporation under such name as the purchasers may select and adopt," &c. This act was amended March 20th, 1875—see Pamph. Acts, 132—by adding new sections thereto. Sections two and three define, and probably enlarge the meaning of the word purchasers, as found in the before recited act, and contain a *proviso*, " that the rights of any and all persons vested before the taking effect hereof shall not be impaired, or affected thereby." Section four shows clearly that what is meant by constituting themselves a body politic and corporate under the statute amended, is, in effect, a reincorporation, but a reincorporation with " the powers and franchises which belonged to the company or corporation originally owning the railroad." That is, as to ownership of property, and liability for debts and engagements of the former company, it is a new corporation. The franchise, faculties, powers, are but a continuation of the old. These, the new corpora-

tion succeeds to, precisely as they were surrendered or lost by the defunct corporation. Does the new corporation acquire the franchise and powers, relieved of the restraints and functional disabilities under which the law had rightfully placed its predecessor? Ever since the great case of *Dartmouth College v. Woodward*, 4 Wheat., it has been conceded that, as a rule, the legislature has no power to take away or impair the powers of a private corporation, which have been granted and acted upon. The abridgment of such granted corporate powers, is an impairment of the obligation of the contract of incorporation, as entered into by the legislative grant.—Cooley's Const. Lim. 279, and note 2. But when in the precedent law, constitutional or otherwise, power is reserved to revoke, change, or modify the powers granted, the rule is different. Accepting the charter having such condition, is valid and binding on the corporators, and the stipulation becomes a part of the organic law of the corporation. To the extent of the power reserved, the legislature is untrammeled by the charter. And so, this legislative inviolability may be bargained away by the corporation; and when so bargained away for a valuable consideration received, the effect is more than a mere personal contract. It is a modification of the corporate franchise, and to that extent, limits the corporate powers.—*Monongahela Nav. Co. v. Coon*, 6 Penn. St. 379; *Mass. Gen. Hospital v. State Mutual Life Assurance Co.*, 4 Gray, 227, 234; *State v. Maine Cen. R. R. Co.*, 66 Me. 488. Under the undisputed facts in this case, we think the Mobile and Montgomery Railroad Company surrendered its absolute right to fix the rate of tolls for the transportation of passengers and freight, and bound itself not to charge more than four cents per mile for each passenger travelling over its line, and not more than twenty-five per cent. higher rates for carrying local freight than the rate charged for carrying through freight. We think, also, that this limitation on its powers inhered in its organic law, precisely as if it had been incorporated in its original charter. When, then, the purchasers of the railroad, under the act approved December 17th, 1873, constituted themselves a body politic and corporate under the name of the Mobile and Montgomery Railway Company, they acquired the powers and franchises of the former corporation, modified and limited as above expressed.

But before the appellant railway company constituted itself a corporation under the act approved December 17th, 1873, the tariff of tolls fixed by the act approved February 21st,.

1870, was changed by the act approved April 17th, 1873. Pamph. Acts, 62. By the later statute, railroads were permitted to charge five cents per mile, and no more, for transportation of passengers, and "may, for the transportation of local freight demand and receive not exceeding fifty per cent. more than the rate charged for the transportation of the same description of freight over the whole line of its road." This, it will be perceived, is a material increase of the tariff rates fixed by the act of 1870. The record does not positively show that the railway corporation availed itself of this increase of rates, but there is much in the record tending to prove it did. If it were necessary to the decision of this case, we possibly might feel ourselves bound to presume the corporation did adopt this increased tariff of charges, as persons, natural or artificial, generally accept tendered benefits and bounties. Aside from this, however, we hold that when the purchasers acquired the franchise and powers of the Mobile and Montgomery Railroad Company by constituting themselves a body politic and corporate under the name of the Mobile and Montgomery Railway Company, it organized them in the condition they were in before the sale; namely, with the statutory restraint they were under as to charges for transportation of freight and passengers.

It is contended, that while the Mobile and Montgomery Railroad Company may have been bound by the limitations on its power to charge for transportation of local freight under the eighth section of the act approved February 25th, 1870, copied above, this did not authorize the imposition of the penalties declared in the act of April 19th, 1873; and that, to the extent of those penalties, the later statute impairs the obligation of the contract. There are several answers to this objection. First, it took away no chartered right of the company. It only provided a penalty for the violation, by the corporation, of its duty, as declared by the law under which it existed, and exercised its corporate powers. It had no authority to violate this law; and hence, the statute neither weakened nor impaired any power granted to the corporation. Second, the act which imposed the penalties, conferred on the railroad the right or privilege of increasing materially, and beneficially to itself, its tariff of tolls for transportation of passengers and local freight. We probably might presume this grant was made at the request of the railroad corporations affected by it; and, as intimated above, that the railroad accepted the grant, by availing itself of the privilege the law tendered to it, by increasing its rate

(38)

of charges as therein authorized. But, third, if the corporation did act under the statute, by increasing its tolls up to the standard therein authorized, then it accepted the statute, and can not be heard to renounce its burdens, while claiming and enjoying its benefits. Fourth, the corporation being bound to transport local freight at a rate not exceeding twenty-five per cent. above its tariff of charges on through freight, the legislature had authority to compel the observance of this duty, by the imposition of penalties for its violation. Such impositions of penalties does not impair the obligation of the contract. The statutes fixing the rate of charges for transportation of passengers and local freight, furnish evidence that the legislature felt it to be its duty to erect this barrier against the power of the corporation to oppress the public. If the rates on local freights, carried short distances, are fixed too low, the remedy is not with us.

Another reason may be urged why the present appellant is bound by the statutes above, which fix the rate of railroad charges. It was incorporated, as we have shown, after we came under the dominion of the constitution of 1868. By section one, article thirteen, of that constitution, it is ordained that "corporations may be formed under general laws, but shall not be created by special act, except for municipal purposes. All general laws and special acts passed pursuant to this section, may be altered, amended or repealed." The last sentence of the section above quoted, with the first somewhat modified, is retained in the constitution of 1875, section one, article fourteen. We hold that the Circuit Court did not err in holding the appellant amenable to the statutes fixing a maximum tariff of rates for transportation of freight.

We have shown above that any demand and payment of charges for transportation of local freight, above fifty per cent. increase on the rate of the same description of freight over the whole line of the railroad, is excessive and illegal. It is in positive disregard and violation of the mandate of the law. It is contended for appellant, first, that inasmuch as the statute has declared the rate of tolls, and has given a penalty for its violation, this remedy is exclusive, and none other can be resorted to. Second, that the payments were voluntarily made, and therefore can not be recovered back. We do not think there is any thing in either of these objections. In regard to the first, any violation of a statute, or disregard of a statutory duty, by which another suffers pecuniary loss, gives to the injured party a right of action for the damages sustained.—*Satterfield, Ex'r. of Grey, v.*

*Mobile Trade Co.*, 55 Ala. 387. And where the wrong consists in the unauthorized demand of money, and its payment under such unauthorized demand, this is money had and received by the demandant for the use and benefit of the payor, unless the case falls within the principle of money voluntarily paid; and a count for money had and received is sufficient for its recovery. The second objection. Railroads have so expedited and cheapened travel and transportation; have so driven from their domain all competing modes of transportation, that the public is left no discretion but to employ them, or suffer irreparable injury in this age of steam and electricity. They have their established rates of charges, and these the shipper must pay, or forego their facilities and benefits. To object or protest would be an idle waste of words. The law looks to the substance of things, and does not require useless forms or ceremonies. The corporation and the shipper are in no sense on equal terms, and money thus paid to obtain a necessary service, is not voluntarily paid, as the law interprets that phrase. In the case of the *Chicago and Alton Railroad Co. v. the C., V. & W. Coal Co.*, 79 Ill. 121, the court, in reply to the objection that the money was voluntarily paid, said: "It can hardly be said these enhanced charges were voluntarily paid by appellees. It was a case of life or death with them, as they had no other means of conveying their coals to the markets offered by the Illinois Central, and were bound to accede to any terms appellants might impose. They were under a sort of moral duress, by submitting to which appellants have received money from them which in equity and good conscience they ought not to retain." The case of *Parker v. Gr. Wes. R. R. Co.*, 7 Man. & Gr. 253, was a suit by a shipper to recover back excessive charges paid the railroad. It was objected that the payment was voluntary. The court, C. J. TINDALL, said: "We are of opinion that the payments were not voluntary. They were made in order to induce the company to do that which they were bound to do without them; and for the refusal to do which an action on the case might have been maintained." The case was assumpsit for money had and received, and the court ruled that the action was well brought. To the same effect are the following authorities: 2 Greenl. Ev. § 121; *Caldwell v. Pedin*, 3 Watts, 327; *Harmony v. Bingham*, 2 Ker. 99; *Bos. & S. Glass Co. v. City of Boston*, 4 Metc. 181; *Chandler v. Sanger*, 144 Mass. 364; *Stephen v. Daniels*, 27 Ohio St. 527; *Tuttle v. Everett*, 51 Miss. 27; *Howe v. State*, 53 Miss. 57; *Robin-*

*son v. Ezzell,* 72 N. C. 231 ; *First National Bank v. Watkins,* 21 Mich. 483 ; *Atwell v. Zeluff,* 26 Mich. 118 ; *McKee v. Campbell,* 27 Mich. 497 ; *Carew v. Rutherford,* 106 Mass. 1 ; *L. & I. Railroad Co. v. Pattison,* 47 Ind. 311. The case of *Potomac Coal Co. v. C. & P. Railroad Co.,* 38 Md. 226, is not in harmony with the above, but we decline to follow it.

It is contended for appellant that the penalties imposed by the act approved April 19th, 1873, Pamph. Acts, 62, were repealed by the act "to prevent excessive charges by railroad companies," approved March 17th, 1875, Pamph. Acts, 243. The language of the former statute is, " any railroad company, manager, agent or officer, violating the provisions hereof, shall be liable to the party injured thereby in double the amount of the overcharge ; but in no case shall the penalty be less than twenty dollars." The language of the latter statute is, " that any officer, manager or agent of any railroad company, lessee, association or corporation managing or operating any railroad in this State, who violates the provisions of an act entitled 'an act regulating the charges for transportation of freight upon railroads within this State,' approved April 19th, 1873, shall be guilty of a misdemeanor, and upon conviction thereof shall be fined not less than one hundred, nor more than five hundred dollars for each offense." There are no words in the statute expressing the intention to repeal the former law, but the argument is that the later enactment is repugnant to the former, and therefore repeals it by implication. The former statute imposes a penalty, to be recovered in a civil suit by the party injured against the railroad company, its manager, agent or officer. The latter enactment seeks to uphold the police authority of the State, and declares a violation of the statute to be a misdemeanor in the officer, manager or agent, by whom it is violated. And, to so frame the statute as to embrace all conceivable infractions of the law, the statute makes the officer, manager or agent alike liable, whether he derives his authority from the railroad company, from a lessee thereof, or from an association or corporation managing or operating the road. Such is our construction of the statute, and we do not think the legislature intended to declare that the railroad corporation, lessee, or any association or corporation that might be managing or operating the railroad, should, as such, be indictable. We hold there is no repugnancy in the two statutes, and the later enactment does not repeal the former.

There is nothing in the argument that the repeal of the

act entitled "an act to furnish the aid and credit of the State of Alabama for the purpose of expediting the construction of railroads within the State," operates as a release of railroad corporations from the restraint imposed by the fifteenth section of that act, or the Mobile and Montgomery Railroad Company, or its successor, from the obligations imposed by the eighth section of the act, under which it received the indorsed bonds of the State. The repealing statute could not divest the rights which had vested under it.—See Pamph. Acts 1874–5, 269; *Wood v. Hustis*, 17 Wis. 416.

The clause, "not exceeding fifty per cent. more than the rate charged for the transportation of the same description of freight over the whole line of its road," found in the act of April 19, 1873, does not mean the *pro rata* allowance which may fall to this road, under the distribution of the products of transportation of through freights proper; those freights which, in their transit, pass over more than one railroad, and merely traverse this road, as a stage in a more extended shipment. We know that much of the freight falling within this description, travels the entire length, or greater part of its journey without change of cars, and in this way, much labor and expense are avoided in the matter of loading and unloading cars. We know, too, that it is the policy of railroad corporations to so connect their lines, as to effect a long, continuous, connected line of transportation; and that under such arrangement, the saving of labor and increase of business resulting from such connection, enable each road to accept as its share of the sum realized from this branch of its business, a sum which would fall much below fair remuneration for receiving, loading, transporting, unloading and delivering the same quantity and description of freight, whose departure and destination were each within the limit of the one road. Hence, we hold that the words, "over the whole line of its road," mean and only mean freight which is taken on at one terminus, and discharged at the other. Thus construed, they furnish an equitable standard by which to graduate the charge for transporting local freight; for it, like the other, involves the labor of receiving, loading, transporting, discharging and delivering. It results that all the testimony of rates on what may be called through freight; that is, freight brought from, or carried to, a point beyond the termini of appellant's road, was improperly received; and in this the Circuit Court erred.

The allowed increase is "fifty per cent. more than the rate charged for the transportation of the same description of

freight over the whole line of its road." The testimony tends to show that these rates frequently varied, to meet the exigencies caused by competing routes of transportation. We suppose there might be other reasons for changing, from time to time, the tariff of tolls. The prevailing rate charged at the time of shipment, is what the legislature meant : not a rate which had prevailed, or might be afterwards adopted. This rate, like the charge for any other description of work and labor, is not in its nature continuous. It may vary with each rising and setting of the sun. It may be that the range of rates never fell below, nor rose above given sums. However this may be, the rates of any particular time in the past furnish no reliable guide for ascertaining present rates.

Various exceptions were reserved to the admission of evidence, and to charges given and refused, but it is believed the foregoing opinion covers the material points raised by the record, and will furnish a solution of the questions likely to arise on another trial.

Reversed and remanded.