## HARLAN v. BRYANT.
### No. 5763.

Circuit Court of Appeals, Seventh Circuit.
Dec. 28, 1936.

Rehearing Denied Jan. 29, 1937.

Frank P. North, of Rockford, Ill., and Edward W. Rawlins and James F. Wright, both of Chicago, Ill., for appellant.

F. H. Stinchfield and Perry R. Moore, both of Minneapolis, Minn., and C. K. Welsh, of Rockford, Ill., for appellee.

Before EVANS, Circuit Judge, and LINDLEY and BRIGGLE, District Judges.

BRIGGLE, District Judge.

Robert Clark Bryant, an infant, brought suit in the District Court against Dr. N. R. Harlan, alleging the negligent infliction of certain injuries to his eyes immediately following his birth on April 20, 1932. The jury found for the plaintiff and judgment was rendered against defendant for the sum of $7,750.50, from which defendant appeals.

The complaint alleges that defendant was negligent in the following respects:

1. That following the birth of plaintiff he wholly failed and omitted to give any personal attention whatsoever to plaintiff.

2. That he left the child wholly in the hands of his assistants and servants, then working under his control and direction and subject to his supervision and authority, and that they, the said servants, negligently and carelessly instilled into the eyes of the infant as an escharotic, some deleterious substance which burned and destroyed the superficial layers of the cornea of both eyes and otherwise permanently injured plaintiff's eyes.

3. That defendant negligently and willfully failed to examine and treat plaintiff's eyes for three·days following the instillation of the escharotic.

We accept the following as the controlling facts which are without substantial dispute:

The father and mother of plaintiff employed defendant, a duly licensed physician and surgeon, to care for the mother during pregnancy and to care for the mother and child at the time of birth. As the time approached for delivery of the child, the mother was taken to the Evangelical Deaconess Hospital in Freeport, a hospital selected by her. After exhausting his efforts to bring about a normal childbirth, the defendant performed a Caesarian operation and delivered the child. Upon removing the child the doctor patted him on the back and clamped and severed the cord. The child cried and opened his eyes, appeared to be normal, and was handed by the doctor to the nurses. The obstetrical supervisor, Miss Morrison, a hospital employee, after swabbing the mouth and nose of the baby caused him to be removed from the operating room to the nursery on the floor below where the usual care was given by those in charge at the hospital. More than an hour later one of the nurses without the knowledge of the defendant undertook to administer the Crede treatment ·and selected a tube which had been supplied the hospital by the State Board of Health, containing a 1 per cent. silver nitrate solution, but she inadvertently squeezed the tube too tightly and lost the contents. This being the only tube available, Miss Morrison thereupon directed one of the nurses to go to the drug department of the hospital and prepare and bring her a 2 per cent. silver nitrate solution. The nurse brought her a brown bottle so labeled and from the contents she administered the treatment to the baby's eyes. An unexpected reaction immediately manifested itself and the eyes turned white. The nurse, thereupon, applied a saline solution, and having only one ounce present procured more from across the hall and continued to apply this solution until she had used four ounces. The eyes and lids were severely burned.

We return to the operating room. After handing the baby to the nurse, Dr. Harlan gave his undivided attention to the mother—the uterus was bleeding profusely from the wound and the placenta was yet to be removed. The situation was a serious one and demanded not only skill but speed. The operation was completed, the wounds closed, and the mother taken to a hospital room, the entire operation occupying some forty minutes. The doctor thereupon washed and dressed, went to the mother's room where he examined her, and then proceeded to the nursery where he found the baby sleeping. He examined the pulse and the cord and finding the baby in satisfactory condition left the hospital. He again visited the child about 7 o'clock that evening when he first learned that a so-called Crede treatment had been administered to the baby's eyes. He prescribed boric acid irrigations and warm and cold compresses to be applied to the eyes. The baby's eyelids continued to become inflamed and swollen and remained so for a long time. Dr. Rideout, an eye specialist, was called the second day after the baby's birth and he prescribed for it, approving the treatment already prescribed by Dr. Harlan.

The story of the parents' efforts to bring some measure of relief to their child by enlisting leading specialists of the Middle West is a most human· and pathetic one. For a considerable time the child was blind, but later showed such remarkable improvement as to astound the eye specialists who had him in charge. At the time of trial in June, 1935, he had regained a substantial vision.

It was the custom for the nurses at the Evangelical Deaconess Hospital to administer the Crede treatment in all normal childbirth cases and was done as a matter of routine. The hospital was a charitable institution and the defendant had no connection therewith except that he was on the medical staff. The nurses were employed by the hospital and if they received compensation were paid by the hos-

pital. The doctor had given no directions for the administration of any Crede treatment and neither had he directed that it be not administered. Its administration was unnecessary in a Caesarian birth; but not bad practice to administer it in all cases.

The following asserted facts are in dispute, but in no event controlling:

That the mother requested one of the hospital nurses to administer a silver nitrate solution and inquired after regaining consciousness if it had been so administered; that Dr. Harlan stated that he saw the condition of the child's eyes for the first time on Friday (second day following birth) and regretted that he had not known of it before; that he wished he had had the forethought to caution the nurses not to administer the Crede treatment as it was unnecessary in a Caesarian birth; that the present crossed condition of one of the eyes is a result of the injury.

We accept the version most favorable to appellee as we are considering alleged error in not directing a verdict. No complaint is made of the amount of the judgment—indeed, if a liability exists the judgment is small.

We think it must be conceded that the asserted grounds of liability No. 1 and No. 3 are without substantial support in the evidence. If the judgment is to be sustained, it must be under the second charge, that is, that the nurses who procured or administered the escharotic were negligent and that for what they did defendant was responsible. We shall, for the purpose of this opinion, assume the negligence and limit ourselves to a consideration of whether the defendant is responsible for the acts of those who brought about the injury upon the doctrine of respondeat superior.

In 1933 the Legislature of Illinois enacted a law making it the duty of any physician or nurse who attends or assists at the birth of a child to instill or have instilled in each eye of the new born baby, as soon as possible and not later than one hour after birth, a 1 per cent. solution of silver nitrate or some other equally effective prophylactic for the prevention of ophthalmia neonatorum (Smith-Hurd Ann.Stat. c. 91, § 108). This law was not in force at the time of the injury complained of, but a somewhat similar act was, except that the provisions thereof were more of an advisory rather than a mandatory nature. The present act is referred to for the reason that it gives recognition to the attending nurse as a proper person to be intrusted with the duty of instillation of the silver nitrate.

It is concededly good practice to administer the Crede treatment in all cases, but the prevailing practice at the time of the birth in question was apparently limited to its use in those cases of normal birth, it being generally deemed unnecessary in cases of a Caesarian section where the amniotic sac had not broken. It will be noted that the present Illinois statute makes no exception.

It cannot be said, therefore, that there was any duty or obligation on the part of the defendant to administer the treatment in the present case. He apparently had no intention of administering such treatment or of directing that it be done, as he gave no orders whatsoever at the time of birth to have it done, and after seeing the baby in the nursery a short time following the birth, he evidently deemed such treatment unnecessary as he left the hospital without giving directions that it be administered. The instillation was brought about by the nurse in charge of the obstetrical department of the hospital upon her own initiative and presumably in the performance of what she deemed to be her duty as an employee of the hospital. The treatment was administered out of the presence of the doctor, and after he had left the hospital, and he cannot be charged with the duty of foreseeing that the same would be undertaken without directions from him. We cannot accept as sound appellee's suggestion in his supplemental brief that the doctor, if he deemed the instillation unnecessary, should have instructed the nurses that it be omitted.

True he gave no orders that the treatment be not administered—but neither did he caution the nurse not to fall down and drop the baby and neither did he give orders that upon reaching the nursery they do not give the baby a cold shower. No inferences are to be had against the doctor under the circumstances here present for his failure to give any negative orders; and under the law existing at the time in question and under the facts present, there was no obligation on his part to administer the treatment, in fact, the assumption that he had formed a judgment to the contrary is justified. Such judgment is shown to have been in accordance with good med-

ical practice. How can he, therefore, be held for the negligent act of another assuming to act, not under his directions, but acting in pursuance of an independent judgment—indeed a judgment contrary to his own? In the absence of a duty to act, we think it cannot be said that he is responsible for another who acts without his authority with a resultant injury.

It might properly be said that the nurses assisting in the operating room at the time of the delivery were the agents and servants of the doctor, for they were under his direct control and supervision and subject to his orders (although a contrary doctrine was held in the case of Olander v. Johnson, 258 Ill.App. 89); but to say that such relation continued in all post natal treatment administered by them or by the hospital would cast too great a burden upon the surgeon. Even though there may be basis for the assertion that the relation of master and servant continued to the extent that they might undertake the performance of orders and directions of the doctor, yet the undertaking of a treatment not expressly or, as we think, impliedly, authorized, was beyond the scope of their authority as his agents.

This court, in the case of Harris v. Fall, 177 F. 79, 27 L.R.A.(N.S.) 1174 (decided in 1910), declined to hold the operating surgeon for the negligent acts of internes in post operative treatment.

In Stapler v. Brownstein, 261 Ill.App. 57, the court declined to hold an operating surgeon for the possible negligent act of an interne in preparing a man's leg for an operation, saying, "The fact that the application of the iodine solution by the interne an employee of the hospital caused blisters to appear is no evidence of negligence or malpractice on the part of plaintiff, especially as it appears that it was the usual practice and usage, in the hospital where defendant then was, for an interne to apply such a solution prior to a contemplated operation by a surgeon," citing Harris v. Fall, supra, Hunner v. Stevenson, 122 Md. 40, 89 A. 418, Guell v. Tenney, 262 Mass. 54, 159 N.E. 451.

In the case of Hunner v. Stevenson, 122 Md. 40, 89 A. 418, 421, the Court of Appeals of Maryland said, "A surgeon may be called many miles from his residence to perform an operation, and, if he is to be held responsible for the negligence of others after the operation, it might mean either that one of special skill would refuse to perform such operations at distant points, or that his charges would be such that no one of moderate means could employ him. It might be detrimental to the public if such a surgeon was required to attend to the after treatment, as it would be impossible for him to do so and perform as many operations as some of them do. It would be unreasonable to expect such a one as the record shows the appellant to be—performing operations in five different hospitals in Baltimore, and in one at Frederick, in addition to his other practice—to continue to dress the wounds and have personal charge of the after treatment in all cases until the patient is discharged from the hospital."

In the case of Covington v. Wyatt, 196 N.C. 367, 145 S.E. 673, the court declined to hold a physician liable for injury to a baby's eyes where he, aided by a nurse, administered a 30 per cent. silver nitrate solution, the solution having been furnished by the hospital. North Carolina at the time had a statute similar to the 1933 Illinois act, making it mandatory that the doctor or nurse administer a 1 per cent. silver nitrate solution, and imposing a penalty for failure to do so. Even in the face of this statute, the court believed that so far as the doctor was concerned, he had a right to rely on the solution furnished by the hospital as a different rule would require the physician to analyze in every case the medicine he sought to use, which would be entirely impracticable and too great a burden to cast upon the medical profession.

Many cases are referred to by appellee [Davis v. Kerr, 239 Pa. 351, 86 A. 1007, 46 L.R.A.(N.S.) 611; Walker v. Holbrook, 130 Minn. 106, 153 N.W. 305; Palmer v. Humiston, 87 Ohio St. 401, 101 N. E. 283, 45 L.R.A.(N.S.) 640; Paro v. Carter, 177 Wis. 121, 188 N.W. 68; Barnett's Adm'r v. Brand, 165 Ky. 616, 177 S. W. 461; Stawicki v. Kelly, 115 N.J.Law, 190, 178 A. 754; Funk v. Bonham, 204 Ind. 170, 183 N.E. 312; Armstrong v. Wallace, 8 Cal.App.(2d) 429, 47 P.(2d) 740; Aderhold v. Stewart, 172 Okl. 72, 46 P.(2d) 340; Forrest v. Abbott, 219 Iowa, 664, 259 N.W. 238; Jackson v. Hansard, 45 Wyo. 201, 17 P.(2d) 659] which have fixed a liability upon a surgeon for negligently leaving some foreign substance in the anatomy of the patient following an operation. In those cases the surgeon sought to escape liability by a reliance upon the attending nurses to properly account for sponges,

etc., used in the operation and by asserting that if there be negligence, it was theirs and not his. In the majority of these cases an independent duty was fixed upon the surgeon to use reasonable care to see that all foreign matter was removed and he was held liable for the breach of such independent duty cast upon him and not on the doctrine of respondeat superior.

Counsel for appellee make the following statement, "Under these circumstances it is Plaintiff's position that the trial Court properly left it to the jury to determine, under appropriate instructions, whether or not the nurses, *while they were performing appellant's duties* toward the Plaintiff, were appellant's servants." (Italics ours.)

This is fairly indicative of the erroneous position assumed throughout by appellee. It is fundamental that if the nurses "were performing appellant's duties" at his instance they were for that purpose his agents and servants. The fallacy lies in the assumption that to them was relegated one of appellant's duties when it conclusively appears that there was *no* duty imposed by law, by contract, by custom, or good practice upon appellant to instill silver nitrate or other prophylactic in the infant's eyes following birth brought about by a Caesarian section.

We accept as sound appellee's assertion that "the true test of the existence of the relation of master and servant in a given case does not depend upon whether the servant was in the general employ of the master, but upon whether the master actually exercises supervision and control over the servant during the time he was such servant. A general master may loan the service of his employee to another for a specified purpose and for a short period of time, in which case the individual to whom such general servants are let is the master, and responsible for their negligent acts so long as he exercises supervision over them." Our conclusion does no violence to this principle because a servant cannot create the relationship by merely assuming to act. So far as appellant was concerned, the nurses in undertaking the instillation here made were mere volunteers. They cannot by their acts impose a duty upon the surgeon, not otherwise existing.

In assuming the care of the mother and child, the defendant impliedly contracted that he possessed and would use in the treatment of his patients a reasonable degree of skill and learning, and he thus owed a duty toward each to exercise such reasonable care and skill as a reasonably prudent and careful physician and surgeon would use under like circumstances. This was his burden, and so far as the record discloses he fully and skillfully met it. He was, likewise, responsible for the negligent acts of others who were his agents or employees and were acting within the scope of their employment or agency; but we think it cannot be said under the circumstances here present that those who may be responsible for the most unfortunate condition of the baby's eyes were in any sense acting for or on behalf of the defendant. We think the conceded facts failed to present a jury question. The judgment is reversed, and the cause remanded.

Reversed and remanded.