68 So.2d 323

**MARTIN v. ANNISTON FOUNDRY CO.**

**7 Div. 179.**

Supreme Court of Alabama.

Nov. 5, 1953.

634

Merrill, Merrill, Vardaman & Matthews, Anniston, for appellant.

Geo. W. Yancey and London & Yancey, Birmingham, for appellee.

LAWSON, Justice.

In this case the plaintiff, W. T. Martin, received serious bodily injuries when he fell to a concrete floor from a scaffold on which he was standing while painting the interior of a building owned by the defendant, Anniston Foundry Company, a corporation.

Plaintiff was an employee of one J. A. Biddle, who shortly prior to April 15, 1950, entered into an agreement with Anniston Foundry Company to paint one of its buildings.

The cause of the accident was the breaking of a steel hook which was made in the blacksmith shop of the foundry company out of steel belonging to that company.

There is only one count in the complaint. Plaintiff seeks to fasten liability for his injuries on the foundry company on the theory that it constructed or prepared the hook which broke, thereby causing plaintiff to fall.

 We have not been favored in brief filed here on behalf of Martin with any discussion of the theory upon which liability for Martin's injury is sought to be placed on the foundry company. The opening sentence of appellant's brief reads: "This case is a damage suit based on the manufacturer's liability doctrine and was tried before a jury in the Circuit Court of Calhoun County, Alabama, on to-wit, May 15, 1952." There is no further discussion of that doctrine and no authority bearing thereon is cited. In view of the reference in appellant's brief to the "manufacturer's liability doctrine" and the language of the complaint, we assume that plaintiff seeks recovery against the defendant on the principle that "one who sells or delivers an article which he knows to be imminently dangerous to life or limb to another without notice of its qualities is liable to any person who suffers an injury therefrom which might have been reasonably anticipated,

whether there were any contractual relations between the parties or not." See Jefferson Standard Life Ins. Co. v. Watson, 242 Ala. 181, 5 So.2d 639; Sterchi Bros. Stores, Inc., v. Castleberry, 236 Ala. 349, 182 So. 474.

After its demurrer was overruled, the defendant pleaded the general issue in short by consent in the usual form.

There was jury verdict in favor of the plaintiff in the sum of $10,000. Judgment was in accord with the verdict.

On motion of defendant duly filed, the trial court entered a judgment setting aside the verdict of the jury and the judgment thereon and granting to defendant a new trial. From that judgment the plaintiff has appealed to this court.

It appears from the record that the trial court entered the judgment appealed from on the ground that it had erred in refusing to give the general affirmative charge in favor of the defendant, which charge defendant had duly requested in writing.

Was the defendant, under the evidence presented, entitled to the general affirmative charge?

In considering that question, we must review the tendencies of the evidence most favorable to plaintiff, regardless of any view we may have as to the weight of the evidence, and must allow such reasonable inferences as the jury was free to draw, not inferences we may think the more probable. Duke v. Gaines, 224 Ala. 519, 140 So. 600; Tyler v. Drennen, 255 Ala. 377, 51 So.2d 516; Carraway Methodist Hospital v. Pitts, 256 Ala. 665, 57 So.2d 96; Hamilton v. Browning, 257. Ala. 72, 57 So. 2d 530. See Sullivan v. Alabama Power Co., 246 Ala. 262, 20 So.2d 224, where we applied this rule, although stated in somewhat different language, where the plaintiff appealed from a judgment granting defendant's motion for a new trial on the ground that error had occurred on the main trial in the failure of the trial court to direct a verdict for defendant.

The defendant, Anniston Foundry Company, was engaged in the business of manufacturing pipe and pipe fittings for sale to the public. It was not a fabricator of steel

for sale. W. F. Deyo was president and active head of the foundry company and H. W. Little was its secretary. L. C. Burke was superintendent of the plant and John L. Wilson the master mechanic in charge of maintaining the company's buildings, machines and equipment. The foundry company operated a blacksmith shop in connection with its maintenance department. Nothing was made or repaired in the blacksmith shop for the public. It was used only for general repair work for the foundry. Wilson, the master mechanic, had direct supervision of the blacksmith shop, but the work therein was done by G. W. Brickhouse and a negro helper by the name of Jacobs. Brickhouse was trained as an automobile mechanic and most of his work was done in the company's garage. Jacobs was only a helper who worked under Brickhouse.

H. W. Little, the secretary, represented the company in entering into the painting contract with Biddle. Under the terms of that contract Biddle was to furnish all paint, labor, material and equipment. Biddle was not subject to the control or supervision of the foundry company and the company neither exercised nor attempted to exercise any such control or supervision. It is conceded that Biddle was an independent contractor and not a servant, agent or employee of the foundry company.

Shortly prior to three o'clock on Saturday afternoon, April 15, 1950, Biddle went to the premises of the foundry company for the purpose of getting his equipment in readiness to begin painting on Sunday morning, April 16. After his arrival at the defendant's plant, Biddle discovered he lacked certain types of steel hooks with which to construct and hang a scaffold on which the painters were to stand while painting the higher parts of the structure. Without consulting Deyo, Little, Burke, Wilson, or anyone else in authority, Biddle went to the foundry company's blacksmith shop and solicited the assistance of Brickhouse in the making of the hooks needed. Brickhouse had almost completed his day's work but finally agreed to assist Biddle for a short period of time after Jacobs, the negro helper, agreed to remain after working hours to assist Biddle. Brickhouse took

Biddle to a "scrap pile" where large and small hard steel rods were piled. Biddle selected the pieces of steel which he wanted to use. He selected the small rods. Brickhouse had nothing to do with the selection of the steel.

Brickhouse and Biddle returned to the blacksmith shop where they, together with Jacobs, began to make the hooks. Biddle drew on the ground a design or designs of the types of hooks he needed, and the evidence supports no reasonable inference other than the work which Brickhouse and Jacobs did at that time was done under the direct supervision and control of Biddle. Brickhouse left before the hooks were completed, but Jacobs remained to be of assistance. For their services Biddle paid Brickhouse two dollars and Jacobs one dollar. No money was paid by Biddle to the foundry company for the services of Brickhouse and Jacobs or for the materials used. As heretofore indicated, under the terms of the painting contract entered into by Biddle and the foundry company, there was no obligation on the part of the foundry company to furnish any material or equipment to Biddle.

Four sets of hooks were made on the afternoon of April 15, 1950. Each set consisted of two hooks of different construction. One hook was so designed that one end of it could fit over a beam and a rope could be placed through an opening in the other end. The other hook was triangular in shape and is referred to in the evidence as a saddle. The "saddle" hooks were designed to be attached to the lower end of the rope so that boards might be placed across them for the painters to stand on.

After the hooks were made, Biddle used all four sets in putting up one scaffold. On Sunday morning, April 16, 1950, Biddle and a helper began painting and used the scaffold which had been put up the previous afternoon. They worked for a period of approximately eight hours and upon completion of that day's work the scaffold was left hanging.

On Monday morning, April 17, 1950, additional hooks were made in the company's blacksmith shop and out of its steel. Such hooks were made under the following circumstances: When Biddle arrived at the plant of the Anniston Foundry Company on Monday morning he asked Wilson to have Brickhouse make the hooks for him. Wilson declined. Biddle took the matter up with Deyo in the presence of the plant superintendent, Burke. Deyo advised Biddle that he would be glad for the latter to use such material as he needed and that the company employees could help him, provided their work was under his (Biddle's) supervision. Burke and Biddle went to the blacksmith shop where Burke advised Brickhouse of Deyo's instructions and told Brickhouse to assist Biddle but to do his work under Biddle's supervision. Biddle instructed Brickhouse to make the hooks according to the same design and of the same type of steel used on the previous Saturday afternoon. Brickhouse proceeded to comply with such instructions and received no advice, instruction or supervision from company officials or employees.

The evidence is in conflict as to the exact time on Monday morning that plaintiff fell and is in conflict as to whether the hook which broke and caused his fall was made on Saturday afternoon or Monday morning. The evidence for the defendant is to the effect that the hook which broke was made on Saturday afternoon, in that no other hooks had been completed before the accident occurred. But the testimony of the plaintiff's witnesses Hill and Mitchell, as we understand it, if believed by the jury would have justified a finding that plaintiff fell at about ten or ten-thirty Monday morning from a scaffold which had been put up on that morning and which was suspended by a hook made on that morning.

The evidence shows without dispute that the hooks were made from the wrong kind of steel. They were made from hard steel which, according to the evidence, breaks too easily to be used for such a purpose. According to the evidence, the hooks should have been made from soft steel, which has an inclination to bend rather than break. The only evidence which even remotely tends to show the hooks were improperly or negligently constructed is to the effect that on Saturday afternoon, after the steel rods were heated, they were placed in water to

cool. It was Biddle who followed this procedure. It appears from the evidence that the placing of the steel rods in the water had a tendency to make the steel even harder and more brittle. As to whether this practice was followed in the making of the hooks on Monday morning, the evidence does not disclose.

Did the defendant construct or prepare the defective hook which caused plaintiff to fall?

If it did not, then it was entitled to have the general affirmative charge given in its favor as requested.

■ The defendant, a corporation, can act only through its servants, agents or employees. But the acts of the servants, agents or employees are not the acts of the defendant unless done in or about the duties assigned them, or in accomplishment of objects within the line and scope of their duties. Perfection Mattress & Spring Co. v. Windham, 236 Ala. 239, 182 So. 6; Tennessee Coal, Iron & R. Co. v. Rutledge, 196 Ala. 59, 71 So. 990.

In rendering assistance to Biddle on Saturday afternoon, April 15, 1950, Brickhouse and Jacobs were clearly not acting for the defendant. No one in authority knew they were so acting or had expressly or impliedly authorized such acts. Such duties had not been assigned to them and the acts which they performed were not in accomplishment of objects within the line and scope of their employment. They were employed to repair and maintain the defendant's machinery and equipment and not to render service to outside persons for compensation or otherwise.

The actions of Brickhouse in connection with the making of hooks on Monday morning, April 17, 1950, were authorized by defendant. But we are of the opinion that the evidence, when viewed in the light most favorable to plaintiff, is supportive of no reasonable inference other than that in performing those particular acts Brickhouse was the servant of the independent contractor, Biddle.

■ It is a well-recognized rule that while one may be in the general employ of another, yet he may, with respect to particular work, be transferred to the service of a third person in such a way that he becomes, for the time being, the servant of that person with all the legal consequences of that relation. Standard Oil Co. v. Anderson, 212 U.S. 215, 29 S.Ct. 252, 53 L.Ed. 480; Woodward Iron Co. v. Brown, 167 Ala. 316, 52 So. 829; Williams v. Central of Georgia Ry. Co., 220 Ala. 298, 124 So. 878; McGrath v. Edward G. Budd Mfg. Co., 348 Pa. 619, 36 A.2d 303; Barton-Mansfield Co. v. Bogey, 201 Ark. 860, 147 S.W.2d 977; Harlan v. Bryant, 7 Cir., 87 F.2d 170.

■ In cases of this nature, consideration must be given to the character of the service to be rendered, the duration of employment, and the one who is paying the employee. These considerations, however, are merely aids in determining the relation and do not necessarily determine the relationship. They are to be applied only in those cases where the evidence does not clearly establish who is the employer. The true criterion is the exercise of power to control the employee at the time of the commission of the act. McGrath v. Edward G. Budd Mfg. Co., supra, and authorities there cited.

The undisputed evidence in this case shows that Biddle was obligated under his contract with Anniston Foundry Company to furnish all equipment necessary to carry out his obligation to paint the building belonging to the foundry company. In order to do so, he borrowed from the foundry company the necessary men and material. Power to control determines responsibility. If Biddle had had employees with the ability to perform the work done, no necessity would have arisen for securing the services of the employees of the foundry company. Biddle assumed control of Brickhouse and directed him to make a certain object out of specified material. He was, for the time being, in complete charge. The fact that Brickhouse and the welders who helped him on April 17, 1950, were paid by their general employer does not, under the circumstances in question, prevent their being employees of Biddle in performing the particular task here involved. The cases of McGrath v. Edward G. Budd Mfg. Co. and

Barton-Mansfield Co. v. Bogey, heretofore cited, dealt with factual situations very similar to the facts of the instant case and our conclusion here is in accord with the conclusions reached in those cases.

Being of the opinion that defendant did not manufacture or furnish the defective hook, we conclude defendant was not responsible for plaintiff's injuries and was therefore entitled to the affirmative charge. No other questions need be considered, in view of that conclusion.

Inasmuch as defendant was entitled to the general affirmative charge, the trial court erred in not so instructing the jury. The trial court was therefore justified in setting aside the verdict and judgment and in granting defendant a new trial.

It follows, therefore, that the judgment appealed from is due to be and is affirmed.

Affirmed.

LIVINGSTON, C. J., and STAKELY and MERRILL, JJ., concur.