118 So.2d 608

**OAKDALE LAND COMPANY, Inc.**

v.

**James Lee FIELDING, as Administrator.**

**6 Div. 729.**

Court of Appeals of Alabama.

March 2, 1960.

Frank B. Parsons, Fairfield, for appellant.

Edw. H. Saunders, Bessemer, for appellee.

CATES, Judge.

Oakdale Land Company, Inc., a corporation, which was engaged in the business (at Brighton, Alabama) of owning and operating a public cemetery, has appealed from a judgment on a verdict for $50 damages on an action brought by James Fielding in his capacity as administrator of the estate of his grandmother, Cooper Williams. The vehicle for the action below consisted of common counts, i. e., 2A for money had and received, and 3A for account. Oakdale made no motion for a new trial.

The tendencies of the permissible inferences from the evidence were:

In 1945, Cooper Williams's husband, Reese Williams, died, and she went to Oakdale Cemetery to see about a grave. She there talked to Julius Berry and paid him $45. Berry gave her a receipt which read:

"Paid in Full 3/29 1945
    Received  * * *
    Forty-five  ....0/100....Dollars
    for two Grave in Oakdale

    $45.00   (Signature) Julius Berry
    Mgr."

Reese Williams was then buried in the cemetery in one of the two graves picked out by his widow.

In June, 1958, the widow died, and her grandson went to the cemetery and was told by Jimmy Alexander, the then caretaker, there was nothing that he, Alexander, could do about it (honoring the receipt given by Berry); that Fielding would have to call the president of the cemetery company, C. J. Donald. Fielding then went to Donald's office in the city of Fairfield, where Donald told him that the corporate records failed to show the sale of any lot to Cooper Williams, nor did they reveal the burial of Reese Williams.

Fielding thereupon went back to Alexander at the graveyard and told him he wanted the grave opened any way, that he would pay for it. He thereupon paid Alexander $50 for the grave in which Cooper Williams was then buried.

The second receipt which was signed by Alexander's wife, Ophelia, was executed,

"Oak Dale Cemetery By Ophelia Alexander."

As presented to us, the most serious question in the case turns on the role of Julius Berry, the 1945 caretaker of the cemetery. Undisputedly he is the one who took the money first paid for the twice paid for grave. For this he issued a receipt, reading in part, "Paid in Full * * * for two Grave in Oakdale Julius Berry Mgr."

C. J. Donald, President of Oakdale, testified Berry then worked for the corporation, drew no salary, was "sexton," [1] and his duties were to open graves, close them, "and collect for them." Berry was not authorized "to sell a grave that was not to be opened at that time." The lowest price of a grave in 1945 was $15. The charge for "opening" — presumably digging — a grave then was $15. The testimony is not clear as to whether or not another $15 was charged to close the grave.

Donald further testified the records of the corporation were kept in the office of the Donald Real Estate Company. Donald never knew of Berry's "selling a grave that was not to be opened right then." "He had no authority to sell anything except the individual graves," but not "graves to be opened in the future."

In 1958, when Fielding's grandmother was buried, Donald testified Jimmy Alexander and his wife worked for Oakdale. The evidence runs:

"Q. Was it part of her duties to write receipts for graves out there.

"A. When they were opened, was Sexton there and she had authority to collect and write a receipt for the grave when it was opened. That's all."

Ophelia Alexander gave Fielding a receipt for $50 in the name of "Oak Dale Cemetery."

Ernest Poole, an undertaker, first came in contact with Julius Berry at the cemetery about 1938. Poole saw Berry (at a time or times unspecified) selling graves at the cemetery and in charge of the men working there. Poole had bought graves from him from 1938 to 1945.

Poole was present when, "Cooper Williams entered into an agreement with Julius Berry to purchase two graves, one to contain the remains of * * * Reese Williams, and another for her * * *." Poole buried Reese Williams. On being shown a photograph of a slab with a marker inscribed "Reese Williams," etc., and a few inches of coping (seemingly of Portland Cement poured at the same time as the slab) along the edge of the abutting grave (presumably the subject of the two payments), Poole identified it as the site of Reese Williams's burial and that he first remembered seeing the slab "about 1947." Another photograph was admitted under Poole's testimony, this one shows both the slab under which Reese's remains rest and the coping enclosed space where Cooper was later interred.

Poole went on to state that at Reese's death Berry was in charge at the cemetery and that he had never seen Dr. Donald there.

Lillie B. Hall, who lived across the street from the Williamses, was also present when Cooper went to the graveyard to see about burying Reese. She described the transaction:

"Cooper Williams asked Julius Berry how much were the graves? He told her "$25 for one and so she said, '$25.00?' She said, 'Lord, I don't have that much money.'

"And he said, 'But, I tell you, if you get two graves', he said, 'if you gets two graves I'll let you have them for $45.' She say 'What you say about that?' She calls me 'Belle' for a nick-

---

1. Cf. Beroujohn v. Mayor, etc., of City of Mobile, 27 Ala. 58, concerning the office of sexton; the English sexton might be custodian of the sacristy and of the graveyard or either.

name. She say, 'What you say about it, Belle?' I say, 'If I was you I'd get it and get the two.' So, she said, 'Well, I'll takes the two.' So she pays him $45 and he wrote her a receipt."

She testified that she went to the funeral and that Reese was buried in one of the graves Cooper had picked out.

" * * * Now, was there a wall put around that on the—around the other grave, the open grave at the same time, or not?

"A. They put the slab on and put them a pen around the other grave, there, at the same time.

"Q. And that was in six or seven weeks after Reese was buried there?

*    *    *    *    *    *

"A. Yes, sir."

Fielding's testimony as to his grandmother's dealings at the cemetery with Berry is of the same effect. He also produced a receipt dated June 8, 1945, given by Berry to his grandmother for $30, "On Grave Slab."

Thus, to summarize the evidence tending to show Berry as authorized to sell graves not only for immediate burial but generally, it might be pointed out that the business of the corporation was apparently confined to the operation of the cemetery; that cemetery lots were in the nature of goods for sale (the business of the corporation being of a nature similar to that of a wasting asset company). Julius Berry was undoubtedly the ranking representative of the corporation ordinarily present during the usual hours at which it might be expected that business would be transacted. The cemetery was located in Brighton, Alabama. The president appears to have conducted a real estate business in the city of Fairfield, at which the formal records of the corporation were kept. Berry was seen not only directing workmen, but also in selling lots.

Viewed most favorably. Oakdale's putting Berry in charge could bring his status to that of an agent held out, i. e., a kind of general agent. Restatement, Second, Agency, under liability of principal to third persons on contracts, at § 195, says:

"An undisclosed principal who entrusts an agent with the management of his business is subject to liability to third persons with whom the agent enters into transactions usual in such businesses and on the principal's account, although contrary to the directions of the principal."

■ That a corporation's liability is the same as a natural person's is shown in C. B. Snyder Realty Co. v. National Newark & Essex Banking Co., 14 N.J. 146, 101 A.2d 544, 548:

"Corporations, like natural persons, are bound only by the acts and contracts of their agents done and made within the scope of their authority. [Citing authority.] * * * a corporation is bound by the act of an officer or agent to the extent the power to do that act has been conferred upon him: (1) expressly * * * (2) by implication * * * or (3) where the act is within the apparent powers which the corporation has caused those with whom its officers or agents have dealt to believe it has conferred upon them. [Citing authority and quoting from] American Well Works v. Royal Indemnity Co., 109 N.J.L. 104, 108, 160 A. 560, 562 (E. & A. 1932) as follows:

" 'The rule is that the principal is bound by the acts of his agent within the apparent authority which he knowingly permits the agent to assume, or which he holds the agent out to the public as possessing. The question in every case depending upon the apparent authority of the agent is whether the principal has by his voluntary act placed the agent in such a situation that a person of ordinary

prudence, conversant with business usages and the nature of the particular business, is justified in presuming that such agent has authority to perform the particular act in question; and when * * * the party, relying upon such apparent authority, presents evidence which would justify a finding in his favor, he is entitled to have the question submitted to the jury. * * *' "

In Goldfield v. Brewbaker Motors, Inc., 36 Ala.App. 152, 54 So.2d 797, 800, Carr, P. J., said:

"In the case of Patterson v. Williams, 206 Ala. 527, 91 So. 315, the Supreme Court observed: 'An agent's authority is measured by the powers which his principal has caused or permitted him to "seem to possess." As to third persons without knowledge or notice, it is not limited to the powers actually conferred and those to be implied as flowing therefrom, but includes as well the apparent powers which the principal by reason of his conduct is estopped to deny.'

* * * * * *

"A careful study and consideration of the evidence in the instant case lead to the conclusion that different inferences can be reasonably drawn from the testimony on the matter of agency. Disputed factual issues being thereby presented, the question of decision addressed itself to the trial judge sitting without a jury. Clark & Barker v. Eufaula Brick Works, 205 Ala. 545, 88 So. 669."

▇▇▇ Aside from the factual background which, in our opinion, justified the submission to the jury of whether or not Berry was authorized to sell both graves in 1945, there is also to be taken into consideration the fact of Reese Williams's body remaining for thirteen years in one of the graves without evidence of any demand that it be removed because of non-payment for the grave; also a short time after his burial, a slab was laid over his resting place, and the coping wall thereof was also extended completely around the perimeter of the adjacent grave. Berry's acts certainly were constructive notice to the corporation of Cooper Williams's occupancy.

Fletcher, Corporations, § 449, states:

"If a private corporation intentionally or negligently clothes its officers or agents with apparent power to perform acts for it, the corporation will be estopped to deny that such apparent authority is real, as to innocent third persons dealing in good faith with such officers or agents.

"Apparent authority is defined as 'that which, though not actually granted, the principal knowingly permits the agent to exercise or which he holds him out as possessing,' and is distinguished from implied authority which is defined as 'that which the principal intends his agent to possess, and which is proper, usual, and necessary to the exercise of the authority actually granted.' "

Under Assignment of Error No. 1 (overruling Oakdale's demurrer) Oakdale argues that Fielding's filing amended Counts 2A and 3A, which allege the time as "on to-wit: the first day of July, 1955," whereas beforehand he had complained of a happening "on the 22d day of June 1958," amounted to a departure, adding a new cause of action, hence Oakdale's demurrer should have been sustained.

We consider the trial court did not err in overruling the demurrers to Counts 2A and 3A. Code 1940, T. 7, § 219, permits joinder of different actions under contracts for the payment of money. In Shaw v. Melton, 38 Ala.App. 264, 81 So.2d 921, eight separate claims for work, labor and materials in one complaint with eight separate counts were stated to be properly joined under § 219, above.

The use of "to-wit" would permit of evidence of transactions at any time before the date of filing of the originating summons and complaint. A plaintiff is not required to aver time so as to gainsay the Statute of Limitations. Ellis v. Black Diamond Coal Min. Co., 265 Ala. 264, 90 So.2d 770.

> "When time is not the essence of the action nor of its description, great particularity of averment is not necessary in pleading it."—Phillips v. Ashworth, 220 Ala. 237, 124 So. 519, 522. See also Great Atlantic & Pacific Tea Co. v. Crabtree, 230 Ala. 443, 161 So. 508.

Next Oakdale argues that the trial judge erred in refusing to give the affirmative charge (hypothesized on belief of the evidence) because (a) the change from 1958 to 1955 posed a new cause of action; (b) the three-year Statute of Limitations had run on the 1955 claim—Code 1940, T. 7, § 24; and (c) the claimed 1945 purchase was void under the Statute of Frauds—Code 1940, T. 20, § 3, cl. 5, for the absence of a written memorandum.

What we have said before of the purposeful flexibility of "to-wit" is well borne out when we scan the evidence. There was only one transaction amounting to a second payment: it is shown by Oakdale's undisputed receipt for $50 on June 22, 1958. We see no new cause of action in the light of T. 7, § 219.

The evidence, in our opinion, if it made a case for Fielding, made out one for money had and received which is governed by the six-year limitation of T. 7, § 21, subdiv. 4. Kelley v. Woodley, 228 Ala. 401, 153 So. 745. Hence, § 24 would be inapplicable. Hairston v. Sumner, 106 Ala. 381, 17 So. 709.

Clause 5 of the Statute of Frauds (Code 1940, T. 20, § 3, cl. 5) reads pertinently:

> "In the following cases, every agreement is void, unless such agreement, or some note or memorandum thereof, expressing the consideration, is in writing, and subscribed by the party to be charged therewith, or some other person by him thereunto lawfully authorized in writing:

> \*      \*      \*      \*      \*      \*

> "(5) Every contract for the sale of lands, tenements, or hereditaments, or of any interest therein, except leases for a term not longer than one year, unless the purchase money, or a portion thereof be paid, and the purchaser be put in possession of the land by the seller."

Oakdale contends (a) that when Fielding's grandmother buried her husband in 1945 she was only put in possession of half the lot, the lots consisting of two graves, (b) the "placing of the curb around the other grave [in which the grandmother was buried in 1958] was not the act of the corporation [Oakdale] but that of Julius Berry \* \* \*"

It is argued from Barclift v. Peinhardt, 18 Ala.App. 340, 92 So. 208, that "possession" in T. 20, § 3, cl. 5, must embrace the whole estate. There Peinhardt, the purported vendor, had other cotenants and, therefore, possession derived from him was not exclusive. The word "estate" in this context is not a territorial expression.

Since the testimony of the 1945 lot purchase, if believed, made out an entire agreement to purchase two graves, possession of a part was, for the purposes of the statute, possession of the whole. Tillis v. Folmar, 145 Ala. 176, 39 So. 913.

Accordingly, we consider there was sufficient evidence from which the jury could have found that the exception to the Statute of Frauds had been met by the payment of the $45 and the grandmother's being put in possession; so that at her death she owned the right of burial alongside her husband. Thus, the $50 undisputedly demanded and paid in 1958 by Fielding to Oakdale would be an unjustified

exaction which Fielding, her administrator, could get back as money paid by him under duress. Williston on Contracts (Rev. Ed.), § 1618; Shaw v. Woodcock (1827), 7 B. & C. 73; Mobile & M. Ry. Co. v. Steiner, McGehee & Co., 61 Ala. 559.

That the confusion as to whether the lot was first paid for (and properly) was not unique, and money had and received was impliedly assumed as the proper remedy, is found in Horsfall v. Handley, 8 Taunt. 135:

"Assumpsit for money had and received. * * * the Plaintiff purchased one of the vaults under Pentonville chapel, * * * The purchase money was paid to one of the church wardens * * * who gave a receipt for it; but no conveyance had made to the Plaintiff. In the year 1817, on the interment of the wife of the Plaintiff in this vault, the sum of 91.18s. 6d., for funeral dues, was demanded by the chapel clerk of the undertaker, who accordingly paid it, without requiring the particulars of such dues, and without any communication with the Plaintiff. Upon the undertaker sending in his bill, the Plaintiff applied to the chapel-clerk for the particulars, who furnished him with an account, in which there were distinct charges for the ground, and for the churchwardens opening the vault. * * * Upon an application being made to the Defendant as senior churchwarden, and on his being asked, if he had received the money, he replied, 'Yes, as we do all other sums.' It appeared also, that by the custom of the parish, all monies were received by the senior churchwarden; and that the sum in question, had been paid over to the treasurer of the trustees of the chapel, * * * Burrough J. held the words of the Defendant not to be an admission of the receipt of the money by him, but reconcileable with the fact, of his co-churchwarden having received it, and paid it over to the trustees; and that the Defendant had properly paid over the money to the treasurer of the trustees; and *as the Plaintiff had his remedy against the latter*, directed a nonsuit." (Italics supplied.)

The minute entries show the case as being submitted to and decided by the jury on Count 2A (for money had and received). The oral charge expressly directed the jury to consider the action only under Count 3A (for account) "the other counts have been disposed of and deleted from your consideration." Oakdale took no exception to the oral charge, but submitted a written charge (D–18) which was affirmative as to Count 3A.

The refusal of requested charge D–18 is cited as Assignment of Error No. 5, which reads:

"5. The Court erred in refusing appellant's written charge, D–18: 'I charge you, Gentlemen of the Jury, that if you believe the evidence in this case you will find for the defendants as to Count 3–A of the complaint as last amended', appearing on Page 12 of the transcript."

In brief, "Appellant adopts the propositions of law cited in Assignment of Error No. 3."

Assignment No. 3 has propositions of law annexed as follows: (a) The test of an amendment adding a new cause of action, etc., citing United States Steel Corp. v. McGehee, 262 Ala. 525, 80 So.2d 256; (b) actions on open account must be begun within three years, etc., citing Code 1940, T. 7, § 24; (c) under pleas in short by consent with leave to offer proof of special matters of defense, the defendant may make issue on the Statute of Limitations, citing the McGehee case, above; (d) the provisions of clause 5 of the Statute of Frauds, T. 20, § 3; (e) possession to carve out an exception under that clause 5 (so as to obviate a writing) "must not only be notorious, but exclusive, embracing

the entire estate to be conveyed," citing Barclift v. Peinhardt, supra; (f) this possession must be notorious and exclusive, citing Knight v. Smith, 250 Ala. 113, 33 So.2d 242; (g) acts of part performance must refer exclusively to the contract, etc., citing Knight v. Smith, above, and Formby v. Williams, 203 Ala. 14, 81 So. 682; (h) a vendee's possession must be at or near the time of an oral contract for an interest in land, etc., citing Formby v. Williams, above; (i) land contracts must describe land with certainty, etc., citing Shannon v. Wisdom, 171 Ala. 409, 55 So. 102; and (j) acts of servants, et al. of corporation unless done, etc., citing Martin v. Anniston Foundry Co., 259 Ala. 633, 68 So.2d 323.

No one of the propositions (a) through (j), either singly or joined with others under the full range of possible permutations and combinations, would lend support for that aspect of Assignment of Error No. 5 which might have been based on the failure of Fielding to make out a cause of action either under indebitatus assumpsit for account or under the old common law action of account, as by a guardian, bailiff or receiver.[2]

Nor does the brief under the heading "Argument" amplify any of the propositions to point out the failure of the evidence to make out a cause of action under Count 3A.

■ In civil appeals the Supreme Court Rules, particularly Rules 9 and 10, Code 1940, Tit. 7 Appendix, require counsel to submit formulations from which the court can cull what it considers the correct principle to fit the stated facts. So that in effect the briefs of counsel should present syllogisms demonstrating the validity of an assignment of error.

■ Where the subsumption from applying fact to law is not self evident, its legal validity should be demonstrated in that part of the brief headed "Argument." Cf. Harwood, "The Brief on Appeal," § 6, How to Find the Law (4th Ed.), p. 453; Wiener, Effective Appellate Advocacy, particularly §§ 34 and 35.

Whatever may have inhered in allowing the cause to go to the jury on a statutory form of action for "account" has, so far as the evidence failing to make a cause of action, been abandoned in argument on appeal.

Affirmed.

---

2. Belsheim, The Old Action of Account. 45 H.L.R. 466; Langdell, Equity Jurisdiction, 2 H.L.R. at 242 et seq.; Maitland, Forms of Action at Common Law, 63, 88. See also Chickering v. Bromberg, 52 Ala. 528.