ARROW TRANSPORTATION COMPA-
NY, a corporation, as Chartered Owner
of THE Steel Barge ATC–304, Libelant,

v.

COOPER STEVEDORING COMPANY,
Inc., a corporation, Respondent-
Petitioner,

v.

ZURICH INSURANCE COMPANY, a
corporation, Respondent-Impleaded.

No. 2633.

United States District Court
S. D. Alabama, S. D.

June 17, 1960.

Alexander F. Lankford III, of Hand, Arendall, Bedsole, Greaves & Johnston, Mobile, Ala., for libelant.

T. E. Twitty, Jr., of Inge, Twitty & Duffy, Mobile, Ala., for respondent-petitioner.

Alex T. Howard, Jr., of McCorvey, Turner, Johnstone, Adams & May, Mobile, Ala., for respondent-impleaded.

DANIEL HOLCOMBE THOMAS, District Judge.

Early on the morning of July 15, 1957, the Steel Barge ATC–304, belonging to Arrow Transportation Company, libelant herein and hereafter referred to as Arrow, was in the process of being loaded with coal ore cargo by Cooper Stevedoring Company, Inc., respondent-petitioner herein and hereafter referred to as Cooper. The barge lay alongside the Alabama State Docks in Mobile, Alabama. Alabama State Docks, pursuant to an agreement, provided Cooper with a crane, an operator, and a flagman, to enable Cooper to fulfill its obligation in loading the barge. During the process of loading the barge, the clamshell bucket attached to the crane allegedly struck and damaged a cargo hatch cover of Arrow's barge. Subsequently, Arrow brought this libel seeking to recover damages from Cooper for its alleged negligence in damaging the hatch cover. Cooper impleaded Zurich Insurance Company, insurers of the Alabama State Docks, alleging that if any damage had resulted to the barge, it occurred through the fault of the State Docks and not through any fault of Cooper.

This cause came on for trial without a jury and now, after due deliberation and after considering the evidence and the briefs submitted by counsel, the Court makes the following findings of fact and conclusions of law.

Findings of Fact

1. Shortly prior to July 15, 1957, Cooper was engaged by Arrow to load the barge ATC–304 at the Alabama State Docks in Mobile, Alabama, on the date of July 15, 1957. Cooper engaged the Alabama State Docks to assist with the loading. The State Docks furnished a crane, a crane operator, and a flagman to Cooper pursuant to the agreement. Cooper paid the State Docks for these services. At all times pertinent to the loading of the barge the crane operator and flagman were on the payroll of the State Docks and were not paid directly by Cooper. Both men required special and skilled training and experience to perform their respective duties.

2. Under the loading procedure, Cooper's walking boss, Mr. Bill Allen, was in charge of the general loading of the barge. The employees of Cooper would open the cargo hatches; after which, the crane operator would load coal ore into the hatch by means of a clamshell bucket attached to the crane. The operator would attempt to place the ore as close as possible to the wings of the hatch; then, Cooper's employees would spread the ore to the areas which the bucket could not reach. The crane operator, not being able to actually observe the hatch into which he was loading, manipulated the crane with the assistance of signals from the flagman on the deck of the barge.

3. Cooper's employees were unsuccessful in rolling back the hatch cover on the Number 2 cargo hatch because it had become jammed or stuck. Thereupon, Cooper's walking boss requested the flagman to signal the operator of the crane to lower the clamshell bucket down to a position where the bucket could strike the edge of the cover and loosen it. The bucket was lowered as requested, but instead of striking the edge of the cover, it struck the top, and consequently inflicted damage to it. The evidence is not clear as to whether this resulted from faulty signals of the flagman, misdirection of Allen, carelessness of the crane operator, or a combination of the three.

4. Zurich Insurance Company was the insurer of the State Docks during the time in question. The terms of the policy agreement between Zurich and the State Docks embody coverage of the damages sought to be recovered herein. Therefore, in the event the Court should find the State Docks liable, this liability would be imputed to Zurich under the terms of the policy.

5. A marine survey, introduced into evidence, estimated the costs of repairs to the cargo hatch cover to be $840 (L–1). Paid repair bills (L–2 and L–3) showed the actual repair costs to the hatch cover to have been $850.68. The Court finds as a matter of fact that this latter figure was the amount of damages suffered by the libelant as a result of the clamshell bucket's striking the hatch cover.

### Conclusions of Law

The Court has jurisdiction of the parties and the subject-matter now before it. 28 U.S.C. § 1333.

There is little doubt but what the libelant is entitled to recover the amount of damages which it claims herein.[1] The method employed to loosen the cargo hatch cover may have been customary and routine, but custom is not an excuse for negligence in the performance of the task of loading a vessel. Stevedores are under a duty to use due care and to act in a prudent manner in the performance of their work in loading and unloading vessels.[2] That duty was breached when the crane operator, either through negligence, misdirection, misjudgment, or a combination of the three, dropped the clamshell bucket on the cargo hatch cover of Barge ATC–304. There is little, if any, dispute among the parties themselves that Arrow is entitled to recover damages in this action.

The primary dispute in this cause is whether Cooper or Zurich, as insurer of the Alabama State Docks, should bear the damages. This dispute resolves itself in the application of the agency doctrine of the "borrowed servant". It is the contention of Cooper that the crane operator and flagman remained the agents of the State Docks throughout the entire period of the loading operation, and inasmuch as these workmen were paid by the State Docks, used its equipment, and remained under its ultimate control, they were State Docks servants and not those of Cooper. On the other hand, Zurich takes the position that for purposes of this particular loading operation, the workmen became the servants of Cooper.

It is a well-established rule of law that a general servant may be lent or hired by his master to another party for some special service or purpose so as to become, for that particular service or purpose, an agent or servant of the other party.[3]

In the Alabama Court of Appeals decision of Ridgeway v. Sullivan-Long & Hagerty, supra (footnote 3), 39 Ala.App. at page 343, 98 So.2d at page 667, it is stated that:

"As to whether one who is the servant of one master has become specially the servant of another is ordinarily a question of fact."

The authorities abound with various tests to be applied in ascertaining the ultimate fact of agency. These numerous tests and their applications led Mr. Justice Cardozo to remark:

"The law that defines or seeks to define the distinction between general and special employers is beset with distinctions so delicate that chaos is the consequence." A Ministry of Justice, 35 Harvard Law Review, 113, at 121.

---

1. 80 C.J.S. Shipping § 105. page 875, and the numerous cases cited therein.

2. New Orleans Stevedoring Co., Inc. v. North Atlantic & Gulf SS Co., 5 Cir., 1954, 213 F.2d 859.

3. Standard Oil Co. v. Anderson, 1909, 212 U.S. 215, 29 S.Ct. 252, 53 L.Ed. 480; Martin v. Anniston Foundry Co., 1953, 259 Ala. 633, 68 So.2d 323; Ridgeway v. Sullivan-Long and Hagerty, Inc., 1957, 39 Ala.App. 341, 98 So.2d 665; Hughes v. Deckard, 5 Cir., 1959, 267 F.2d 697.

A reading of the various decisions dealing with the "borrowed servant" doctrine more than substantiates this observance.

In Alabama, as is the case in a number of other jurisdictions, the primary test which has been applied in determining the issue of the agency relationship is one of control. In Martin v. Anniston Foundry Co., supra (footnote 3), 259 Ala. at page 637, 68 So.2d at page 327, the Alabama Supreme Court concluded:

"In cases of this nature, consideration must be given to the character of the service to be rendered, the duration of employment, and the one who is paying the employee. These considerations, however, are merely aids in determining the relation and do not necessarily determine the relationship. They are to be applied only in those cases where the evidence does not clearly establish who is the employer. *The true criterion is the exercise of power to control the employee at the time of the commission of the act.*" (Emphasis supplied.)

In the United States Supreme Court decision of Denton v. Yazoo & M. Valley R. Co., 1931, 284 U.S. 305, 308, 52 S.Ct. 141, 142, 76 L.Ed. 310, the borrowed servant rule is stated as follows:

"When one person puts his servant at the disposal and under the control of another for the performance of a particular service for the latter, the servant, in respect of his acts in that service, is to be dealt with as the servant of the latter and not the former. This rule is elementary * * *."

The test which is perhaps the most applicable to the facts of the present case is found in Western Marine & Salvage Co. v. Ball, 1930, 59 App.D.C. 208, 37 F.2d 1004, at page 1007, where the court in quoting from 55 A.L.R. 1263, 1264, states as follows:

"In determining who is liable for the negligence of a servant in the general employment of one person, but who at the time of the injury complained of was assisting an independent contractor, the proper test seems to be, *whose work was being performed, and who had the power to control and direct the servant in the performance of that work.*" (Emphasis supplied.)

It is not necessary in the determination of the issue now before the Court to enumerate all the authorities which have discussed the borrowed servant doctrine. It is of interest, however, to note comment c of the American Law Institute's Restatement of the Law of Agency, Section 227, which is quoted at length in the Ridgeway decision, supra (footnote 3), 39 Ala.App. at page 345, 98 So.2d at page 668.

"c. Factors to be considered. A continuation of the general employment is indicated by the facts that the general employer may at any time substitute another servant, that the time of employment is short, and that the lent servant has the skill of a specialist.

"A continuance of the general employment is also indicated in the operation of a machine where the general employer rents the machine and servant to operate it, particularly if the instrumentality is of considerable value. Normally, the general employer expects the employee to protect his interests in the use of the instrumentality and these may be divergent from the interests of the temporary employer. If the servant is expected only to give results called for by the temporary employer and to use the instrumentality as the servant would expect his general employer would desire, the original service continues. Upon this question, the fact that the general employer is in the business of renting machines and men is relevant, since in such case there is more likely to be an intent to retain control over the instrumentality."

From the above discussed authorities it is obvious that the courts have established a rather thin-line series of

tests in determining the borrowed servant doctrine question. It is equally apparent that various factual situations necessitate such tests. This is because the determination of the ultimate issue of whose service a particular servant is in, lies on one or the other side of the thin-line of control. This control is the actual control asserted at the time of the incident giving rise to complaint. Control is determined by ascertaining under whose direction the employee was working, whose work was being done, and who directed the performance of that work. These tests must be applied to each particular factual circumstance in order to determine whether or not the servant has become the temporary servant of the borrower or remains the servant of the general employer or lender.

█ Considering the facts in evidence in light of the foregoing principles of law, this Court is of the opinion that the crane operator and the flagman were servants of Cooper Stevedoring Company at the time of the incident giving rise to the libel herein. It was not the work of the State Docks to utilize the clamshell bucket in loosing the hatch cover on the barge ATC–304. It was the exclusive work of the stevedore to prepare the hatches for loading. This action by the crane operator and the flagman was work performed for Cooper and under Cooper's direct control. The use to which the crane was being put at the time of the accident was not the normal, ordinary use for which the crane was designed. It was not the use that the crane operator and flagman would expect their general employer, the State Docks, to desire.

Perhaps what has been said draws a line even thinner than that established by the authorities in this area of the law, but if control at the time of the occurrence of the act is the criterion by which to determine, for the purpose of liability, in whose employment a servant is, the Court is of the opinion that control here was in Cooper by virtue of its walking boss's instructing or requesting the flagman and crane operator to use the equipment to loosen the hatch cover. This conclusion is not in conflict with Standard Oil Co. v. Anderson, [212 U.S. 215, 29 S.Ct. 256] supra (footnote 3), where the Supreme Court found that the winch operator was doing the general employer's "own work, by and through its own instrumentalities and servant, under its own control." Nor is this a case of mutual cooperation and coordination in performing the work. To reiterate, the work being done at the commission of the act was exclusively that of Cooper; therefore, the servants became those of Cooper for purposes of liability.

Having reached this conclusion, it is not necessary for the Court to pass upon the question of whose employment the servants were in during the entire loading operation. Realizing, however, the importance of the determination of this question with regard to vessel loading and unloading procedures at the Alabama State Docks, I am of the opinion that under the authorities the flagman and crane operator remained under the employment of the Alabama State Docks. Here, the servants removed themselves temporarily from that employment and became the employees of Cooper in the task of loosening the hatch cover.

█ Cooper has argued that Arrow has failed to prove satisfactorily its damages in this libel. At the trial of the cause, the libelant introduced into evidence a survey report, made some thirty days subsequent to the accident, wherein the repair costs were estimated at $840. Repair bills were introduced which were paid by the libelant in the amount of $850.68. Cooper contends that libelant has failed to connect these instruments with the cargo hatch cover in question, and therefore has failed to sustain the burden of proof as to damages. Cooper further argues that the only reliable evidence offered as to actual damages was the testimony of survey experts who, without observing the actual damaged cover, stated the damage could not have been any more than from $75 to $125.

█ The Court cannot bring itself to concur in these contentions of Cooper.

Here, the libelant has proved its claim for damages through the introduction of documents into evidence which are substantially connected with the accident in issue. This evidence is more convincing than the hypothetical estimate made by the experts who never actually viewed the damaged barge.

Decree for libelant in the amount of $850.68, plus interest from the date of judgment, and costs.